MaRis, Circuit Judge,
sitting by designation, delivered the opinion of the court:
By Senate Resolution 257, adopted June 1,1954, the United States Senate referred to this court Senate Bill No. 2429, 83d Congress, entitled “A bill for the relief of certain American employees of the former Shanghai Municipal Council.” The reference was made under sections 1492 and 2509 of title 28, United States Code, with the request to “proceed expeditiously with the same, in accordance with the provisions of said sections, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.” Following the reference seven of the claimants named in the Senate bill and the personal representatives of three others, all of whom we shall call plaintiffs, filed petitions in this court under Rule 18. The petitions claim wages, pensions and other benefits due the plaintiffs, or their decedents, under their terms of employment with the Shanghai Municipal Council. The plaintiffs assert that they have been deprived of the amounts claimed by reason of the action of the United States in relinquishing its extraterritorial rights in China and joining with Great Britain in rendering back to China the Shanghai International Settlement and thus terminating the Shanghai Municipal Council without providing the necessary safeguards to ensure that the Chiiiese Government would assume and pay the amounts due the plaintiffs by the Council.
The International Settlement at Shanghai, China, had its origin in a set of Land Regulations which were promulgated pursuant to separate treaties entered into by China with foreign nations, including the United States, by which the *15 Treaty Powers acquired extraterritorial rights in China.[1] The Shanghai Municipal Council, the governing body of the Settlement, was endowed with general powers of municipal administration. It levied and collected taxes, exercised normal local governmental powers, entered into contracts, and operated the ordinary municipal facilities. It consisted of 14 members elected by qualified taxpayers residing in the Settlement. The Council owned the assets of the Settlement, holding land, public buildings, facilities, securities and cash. It could sue and be sued in specially constituted consular courts.
The plaintiffs were employed in various positions by the Council in the administration of its municipal functions. The United States was not responsible or in any way concerned with the recruitment of the plaintiffs or any other persons employed by the Council. Their salaries were paid in local Chinese currency. Under the terms of employment the plaintiffs were entitled to increases in pay, holidays, leave, medical benefits, retirement on pension at ages 50 or 55 after 20 years continuous service, and to withdrawals from the Superannuation Fund to which contributions were made both by deductions from plaintiff’s salaries and by the Council. In March 1937, when the terms of employment were revised, Chinese currency and the rates of its exchange into pounds, dollars and yen were relatively stable. An employee on retirement would be paid in local currency the amount to his credit in the Superannuation Fund (his own and the Council’s contributions). It was assumed that he would be able to derive a return from this amount of 5 percent per annum. Deducting the amount of this assumed return from one-half the employee’s salary at the date of his retirement, the Council would pay him the difference quarterly as a pension. Although the difference was determined in local currency it was payable, in the case of a foreign employee, either in local currency or in foreign cur *16 rency at fixed rates of exchange, at the option of the employee. In 1941 the terms of employment were revised to provide, inter alia, that in the case of a foreign employee payment would be made in the “Council’s discretion either in the alternative currency applicable or in local currency.”
During 1931 the Japanese had invaded Manchuria and by July 1937, the hostilities had been extended into China proper. The Chinese economy was from that time forward subjected to the strain of a life and death struggle. By 1939 inflation had so affected the Chinese currency that the Shanghai Municipal Council found it necessary to supplement salaries with extra allowances for the cost of living. By 1940 these allowances exceeded 100 percent of the base pay.
On December 8,1941, following the attack on Pearl Harbor and the declaration of war between Japa-n and the United States and Great Britain, the Japanese took control of the Settlement and the Council. Three of the plaintiffs had left China and were residing in the United States before this event. Seven of the plaintiffs continued to work for the Council until they were interned by the Japanese. In 1943 the Council was replaced by a Japanese puppet regime. Between 1943 and 1945 the seven plaintiffs were repatriated to the United States.
On January 11,1943, Great Britain and the United States signed separate treaties with the Republic of China relinquishing their extraterritorial rights in China. Subsequently, other treaty powers entered into similar treaties with China. The pertinent provisions of the United States treaty are as follows:
“The United States of America and the Republic of China, desirous of emphasizing the friendly relations which have long prevailed between their two peoples and of manifesting their common desire as equal and sovereign States that the high principles in the regulation of human affairs to which they are committed shall be made broadly effective, have resolved to conclude a treaty for the purpose of adjusting certain matters in the relations of the two countries * * *
* * *
“ARTICLE III
“The Government of the United States of America considers that the International Settlements at Shanghai *17 and Amoy should revert to the administration and control of the Government of the Republic of China and agrees that the rights accorded to the Government of the United States of America in relation to those Settlements shall cease.
“The Government of the United States of America will cooperate with the Government of the Republic of China for the reaching of any necessary agreements with other governments concerned for the transfer to the Government of the Republic of China of the administration and control of the International Settlements at Shanghai and Amoy, including the official assets and the official obligations of those Settlements, it being mutually understood that the Government of the Republic of China in taking over administration and control of those Settlements will make provisions for the assumption and discharge of the official obligations and liabilities of those Settlements and for the recognition and protection of all legitimate rights therein.” 57 Stat. 767, 769.
In September 1945 Japan surrendered. China was liberated and control of the Settlement at Shanghai passed to the Government of China pursuant to the treaties. The old Shanghai Municipal Council was not reestablished by the Government of China. In 1946 a Liquidation Commission was appointed, consisting of eight Chinese officials, to consider the problems connected with the administration and control of the former Shanghai Municipal Council, including specifically its obligations to its former employees. Attached to the Liquidation Commission were four Foreign Advisers representing the Governments of the United States, Great Britain, Switzerland, and The Netherlands. The Liquidation Commission appointed a subcommittee consisting of the four Foreign Advisers and four Chinese members to determine the rights of the former employees of the Council and to make recommendations thereon to the Commission. The subcommittee began its deliberations in November 1946. Differences arose as to whether the cutoff date for determining the Council’s obligations to its employees was December 8, 1941, when Shanghai fell into the control of the Japanese, or September 30,1945, the date on which China took control of the Settlement. It was agreed that provisional payment of superannuation and pension benefits be ascertained to December 8,1941, without prejudice to the ultimate determination of *18 the proper cutoff date. A controversy then arose over the conversion rates to be used in calculating these amounts. The 1941 revision of the terms of service provided for payment of superamiuation withdrawals “either in the alternative currency applicable or in local currency” at the Council’s discretion. The Foreign Advisers contended that the 1941 provision should be read in the light of its 1937 antecedent. Complete deadlock ensued within six months after the deliberations of the Liquidation Commission were begun. The crux of the controversy was the question as to who should bear the burden of inflation. It was agreed to refer these questions, namely, that of the cutoff date and the foreign currency payments, to Nanking for diplomatic consideration, the Chinese reporting to their Government and the Foreign Advisers reporting to their respective Ministers. Such reports were made, but nothing came of the diplomatic exchanges. The subject was still under consideration when the Chinese Communists occupied Nanking and Shanghai in the Spring of 1949.
Meanwhile a separate determination of the obligations of the former Council to its employees was made in a study by the British Government as a result of which the accounts of the Council’s former employees were tabulated in a document called the Morcher Document. In July 1947 the Foreign Advisers predicated their recommendations to the Liquidation Commission upon its contents, with some modifications. In 1943 the British Government had advanced amounts due from the Council to pensioners and in 1949 it made ex gratia payments to British nationals formerly employed by the Council. The plaintiffs compute their claims upon the figures shown in the Morcher Document, the solutions proposed by the Foreign Advisers, and the British terms of settlement, claiming that a total of about $224,-648.39 is due them under their employment contracts, payment of which they urge this court to recommend to the Congress. The United States, on the other hand, asks that we report that there is no legal or equitable basis for the allowance of these claims.
The plaintiffs contend that equities arose in their favor as a result of the effect upon them of what they characterize *19 as the precipitate action of the United States in signing the treaty of relinquishment without providing adequate safeguards for the protection of their interests. This action, they say, deprived them to their detriment of legal remedies which might otherwise have been available to them.
We think that the charge is wholly unfounded that the action of the United States in signing the treaty of relinquishment was “precipitate”. The Government of the United States, as early as the Treaty of October 8,1903,[2] had announced its intention of relinquishing its extraterritorial rights in China when that country’s legal and judicial systems had been sufficiently modernized and reformed. During the ensuing 40 years it was clear that events were proceeding in the direction of the relinquishment of such rights. Thus, the Washington Conference of 1921-1922 by resolution[3] and the Nine-Power Treaty of February 6,1922,[4] which followed the Conference, expressed sympathy with China’s desire to eliminate extraterritoriality. At the same time a Commission was established to determine whether the relinquishment of extraterritorial rights was then feasible. The Commission reported in 1926, pointing out the deficiencies which still must be cured in order to bring China’s law and procedure into conformity with the standards of the Western nations. In 1926, the Secretary of State of the United States again expressed the willingness of this country to continue negotiations on the subject. Then in 1929 the National Government of China announced the end of extraterritoriality, effective January 1,1930. The date was subsequently postponed to January 1, 1932, and the proposal was not then carried out because of the Japanese invasion of Manchuria.
The treaty of relinquishment which was signed on January 11,1943 was a war measure. The Japanese had overrun eastern China and the Chinese Nationalist Armies had retreated to Chungking in the far western fastness of Szechwan Province. There was grave danger that they would give up the struggle and come to terms with the Japanese who, under *20 the slogan of “Asia for the Asiatics” were appealing to the Chinese to turn on the “Western imperialists” and join the “co-prosperity sphere”. In this critical juncture the United States and Great Britain deemed it essential to give up their extraterritorial rights in China in order to give the Chinese National Government the greatest possible encouragement and prevent its threatened collapse. It would appear that nothing else could have served better to accomplish the dual purpose of counteracting anti-Western Japanese propaganda and reviving the Chinese Nationalists’ flagging spirits. For the foreign extraterritorial rights had always been regarded by the Chinese as a badge of inferiority. Their relinquishment thus reestablished China as a sovereign nation equal in dignity to those of the West.
Nor do we think that the plaintiffs are correct in their contention that the provisions of the treaty of relinquishment for the assumption and payment by the Government of China of the claims of the plaintiffs and others against the Shanghai Municipal Council were so inadequate and unsafeguarded as to give rise to an equity in their favor against the United States. On the contrary, it seems clear that they were the normal, usual provisions included for such purposes in a treaty with a friendly government. Certainly it was not a departure from customary practice in such circumstances to accept as adequate assurance of performance the formal agreement of the Chinese Government that it would “make provision for the assumption and discharge of the official obligations and liabilities of those Settlements [at Shanghai and Amoy] and for the recognition and protection of all legitimate rights therein.” Indeed, we have been referred to no instance in the diplomatic history of the United States in which security for the payment of claims, such as the retention of physical assets, has been obtained under such circumstances. Certainly such special security for the payment of claims was not obtained by the United States in connection with its relinquishment of extraterritorial rights and foreign settlements in Japan in 1894,[6] by Belgium-Luxembourg, *21 Norway, Canada, Sweden, and The Netherlands when they relinquished their extraterritorial rights in China in 1943, 1944 and 1945, or by the United States when it agreed to the abolition of the international regime in Tangier, Morocco, in 1956.[6]
This brings us to the plaintiffs’ contention that the treaty of relinquishment deprived them of remedies for the enforcement of their claims, to their financial detriment. To support this contention the plaintiffs rely on the proposition that the history of the Council warrants the conclusion that it would have liquidated its liabilities to its employees before it handed over its assets and responsibilities to its successor, if it had been permitted to do so. Therefore, say the plaintiffs, the United States interfered, without legal justification or excuse, in the status which existed between the plaintiffs and the Council by aiding in the transfer to China of the administration and control of the assets and liabilities of the International Settlement. This contention brings us to the crux of this case, namely, whether there are equitable considerations, within the meaning of section 2509 of title 28, United States Code, which furnish any support for the plaintiffs’ claims. For the plaintiffs concede that the circumstances do not support legal claims on their part against the United States.
The position of the United States is that the loss of plaintiffs’ employment with the Shanghai Municipal Council and the emoluments thereof did not arise by reason of any wrongful or inequitable act upon the part of this Government which would bring the case within the broad principles of equity described by this court in Burkhardt v. United States, 1949, 113 Ct. Cl. 658. In the Burkhardt case the plaintiffs were deprived of the use of their property by the United States in the exercise of its paramount right to improve commerce and navigation, for which there was no recourse in a court of law. Belying upon United States v. Realty Company, 1896, 163 U.S. 427, 440, this court held that the term “equitable claim”, which appears in section 2509, is used in the broad moral sense of a claim based upon general *22 equitable considerations, a claim binding in honor and good conscience even though not entitled to recognition in a court of law. While the plaintiffs concede that there was no “taking” of their property for public use by the United States, such as was found by this court to have occurred in Gray v. United, States, 1886, 21 Ct. Cl. 340, they contend that there is, nonetheless, a moral obligation upon the United States in their favor. But the plaintiffs do not tell us how the United.States failed in the fulfillment of any such obligation to them.
That the treaty was a proper subject of negotiation is undisputed. Its purpose is self-evident, namely, the giving up of extraterritorial rights in China. But, urge the plaintiffs, the United States instead of exacting a promise from the Chinese National Government to satisfy the obligations of the Shanghai Municipal Council should have retained the right to physical control of its assets by the Council because the Council would have honored its obligations to its employees before turning its assets over to China. This argument is based upon a speculative premise, however. For there is no evidence as to the financial condition of the International Settlement after the Japanese occupation. Nor is there any certainty as to how the Council would have settled these claims in view of the inflationary situation which then existed. For by the time the International Settlement was liberated from the Japanese in September 1945, and thereafter, the Chinese currency had so far been subject to inflation that the official rate of conversion of Chinese dollars into either pounds or United States dollars was no more than a euphemism.
All that the record shows is that on September 30, 1945, the Government of China took control of the Shanghai International Settlement, over which it had always had sovereignty subject only to the treaties granting extraterritorial rights therein, and with it the assets of the Shanghai Municipal Council and that negotiations were started for the recognition and payment by that Government of the claims against the Council, including the plaintiff’s claims. There is no suggestion that these negotiations were not conducted in good faith. The difficulty, of course, was that the ques *23 tion as to the currency in which the claims were to be paid had not been resolved when the Chinese Communists overran the mainland.
We think that the losses suffered by the plaintiffs did not result from any action of the United States but rather from circumstances beyond the control of any of the parties concerned. For the claims of the plaintiffs must be viewed realistically in the light of the history of events which took place in China during the period in question. The inescapable basic fact is that for many years prior to the treaty of relinquishment the Japanese forces had been in possession of eastern China and that immediately after Pearl Harbor they moved into the International Settlement at Shanghai and thereafter terminated the functioning of the Shanghai Municipal Council, interning the seven plaintiffs who were still there, and later establishing a puppet- government of their own. Thus, it was the Japanese occupation and not the treaty of relinquishment which actually terminated the Shanghai Municipal Council as a functioning body and ended the plaintiffs’ services to it. It thus appears that the relinquishment of extraterritorial jurisdiction by the United States and the giving up of its rights in the Shanghai International Settlement was but the recognition of an accomplished fact and of the inexorable march of history.
It is true, of course, that the plaintiffs have not realized anything upon their claims from the Chinese Government under the treaty of relinquishment. But this is primarily because of the tremendous inflation of the Chinese currency which took place during and after the war.- The United States, however, was not responsible for this inflation. It was an economic fact of life in China during that period which affected everyone who lived there and which doubtless caused untold hardship and financial loss to millions. And the subsequent history of the Chinese National Government, its loss of China proper to the Chinese Communists and its retreat to Formosa, appears to have made further progress in the negotiations for settlement economically impossible.
We conclude that the claims of the plaintiffs are not supportable either at law or upon the broader moral principles of equity recognized in Burkhardt v. United States, 1949, *24 113 Ct. Cl. 658. Whether or not anything should be paid to them as a gratuity rests, of course, within the sole discretion of the Congress. If the Congress should determine to authorize payments ex gratia to be made amounts appropriate to be paid are set out in Table T annexed to the findings of fact.
This opinion, together with the findings of fact which follow, will be certified to the Congress pursuant to Senate Resolution 257, 83d Congress.
Laramore, Judge; Madden, Judge,; Whitaker, Judge, and JoNEs, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
I. THE REFERENCE
1. During the first session of the 83d Congress[1] companion bills were introduced in the Senate (S. 2429) and the House of Representatives (H. R. 4924) “for the relief of certain American employees of the former Shanghai Municipal Council.” The Senate bill has been referred to this court as hereinafter described.
2. (a) The opening sentence of S. 2429 would have directed the payment “* * * to the persons hereinafter named the sums set forth after their respective names, or to their heirs, executors, or administrators * *
(b) Twelve persons were listed, with amounts reflecting a total of $270,326.80, as follows:

(c) The bill would have declared that:
These sums represent the actual amounts due to said American claimants, without interest, of amounts deducted from their salaries and other amounts to secure *25 their retirement benefits arising out of their employment by the former Shanghai Municipal Council * * *.
Continuing, the bill described the Shanghai Municipal Council as:
* * * an international protectorate which had been sponsored and supported by the United States * * * in conjunction with other treaty powers since 1844, and which was the governing body of the International Settlement at Shanghai until January 11, 1948 * * *.
The bill would have further declared that on January 11, 1943:
* * * the American and British Governments signed treaties with China, without the prior concurrence of the other treaty powers, which provided for the rendition of the International Settlement at Shanghai without the necessary and essential safeguards to protect the vested interests of the above claimants * * *.
Continuing, the bill said that the American and British Governments:
* * * by agreeing [without the necessary and essential safeguards] that the Chinese Government should assume the obligations of the Shanghai Municipal Council to these claimants, deprived these American claimants of their legal remedies except to petition the Chinese Government for relief, which these claimants have done, to no effect * * *.
Summarizing, the statement in the bill concluded:
* * * all of which was done in the general national interest of the United States * * * but to the particular financial detriment of these individual American claimants. * * *
3. (a) Comment on the bill by the Department of State was requested by the (Senate) Committee on the Judiciary.[2] The departmental report was duly prepared and submitted to the Bureau of the Budget (Executive Office of the President) for clearance before its submission to the Senate Committee.[3] After clearance the report was fonvarded to *26 the Senate Committee with a separate memorandum setting forth the (contrary) views of the Bureau of the Budget.[4]
(b) The departmental report contained the following:
* * * It is the opinion of the Department that although no obligation exists on the part of the United. States Government to pay the. claims of these Americans a considerable measure of justification can be adduced on humanitarian grounds for the appropriation, by the Congress of funds with which to make ex gratia payments to meet the minimum bona fide claims of these persons. * * *
(c) The memorandum which the Bureau of the Budget forwarded to the Department of State for transmittal to the Senate Committee with the departmental report contained the following:
* * * The Bureau of the Budget sees no justification for the enactment of this bill. The United States has neither a legal nor an equitable obligation to pay an advance on a claim of this kind against another government. * * *
4. (a) On May 27, 1954, the Senate Committee on the Judiciary favorably reported Senate Besolution 257 (83d Congress, 2d session), providing for the referral of S. 2429 to this court w* * * pursuant to sections 1492 and 2509 of title 28, United States-Code * * [5]
(b) The committee report accompanying S. Bes. 257 contained the following:[6]
*27 * * * The Committee on the Judiciary, after thorough study, and a hearing on the part of a subcommittee of the committee, came to the conclusion that there were certain equities in favor of these claimants, but neither the subcommittee nor the full committee had the time or the facilities to determine to what extent the United States should assume this obligation and, therefore, recommends that this matter be submitted to the Court of Claims for the discerning treatment it renders in congressional reference cases. * * *
(c) S. Bes. 257 was adopted by the Senate on June 1,1954, and was promptly transmitted to the court. On June 3,1954, notices pursuant to Rule 14 were issued by the Clerk.
II. CLAIMANTS; CLAIMS; OEESETS; GENERAL
5. (a) Claims have been asserted here by seven of the persons listed in S. 2429 and on behalf of three others by their personal representatives. Two of the individuals so listed failed to respond to the Clerk’s notice of the reference.[7]
(b) As hereinafter used in these findings the term “plaintiffs” is descriptive of the ten persons named in S. 2429 by whom or on whose behalf claims have been presented in this proceeding.
6. Each of the plaintiffs was at one time employed by the Shanghai Municipal Council and, with the exception of Mrs. Rose E. Lane, each was an American citizen at the time of such employment.[8]
7. There is no evidence to suggest that the United States was responsible for or in any way concerned with the recruitment of persons employed or to be employed by the Shanghai Municipal Council.[9]
8. (a) At the time of the Japanese attack on Pearl Harbor, on December 8 (Shanghai time), 1941, seven of the plain *28 tiffs were in Shanghai. All were subsequently interned by the Japanese.[10] Each of them was thereafter recognized by the United States as an American national.
(b) During the 1946-47 negotiations (hereinafter described) to settle the claims of former employees of the Shanghai Municipal Council with the Government of the Republic of China, all of the plaintiffs were listed and considered as American nationals.
9. (a) Immediately upon the outbreak of hostilities between Japan and the Allied Nations, the control of the International Settlement at Shanghai passed to the Japanese through an act of war. All of the seven plaintiffs who were caught in Shanghai remained at their posts in the service of the Council, and continued their employment for varying periods after the beginning of hostilities.[11]
(b) In December 1942, through diplomatic exchanges between the United States and the Swiss Consulate in Shanghai, questions were raised as to the status of Americans continuing in the service of the Shanghai Municipal Council. The diplomatic exchanges were completed in March 1943. Meanwhile, the Department of State advised the American Legation at Bern that the “Swiss Consul General Shanghai should * * * inform American nationals that voluntary continuation of functions at request of Japanese authorities will make them ineligible for financial or other assistance * * During 1943 all of the seven plaintiffs were interned by the Japanese. None is now charged by defendant with conduct requiring forfeiture of a national’s right to assistance and protection.
10. (a) The Department of State, acting through the Swiss Consulate in Shanghai, made advances of money to each of the interned plaintiffs (and, in some instances, to members of their families) for subsistence and medicines, *29 and for tbe expenses of passage in repatriation to tbe United States. One of these plaintiffs has repaid to the United States all such advances.[12] One has repaid all of such advances except a very small amount.[13] Repayment has not been made by five of the plaintiffs.[14]
(b) Defendant asserts that the amounts of the unpaid advances should be offset against any payments that may be authorized to be made to the six plaintiffs who have failed to repay such advances, irrespective of the basis of such authorization.[15]
11. Plaintiffs’ claims are for divers emoluments of their employment by the Shanghai Municipal Council. Three of the plaintiffs, for example, had retired and were entitled to pensions. The pensions were duly paid through September 30, 1941, but no payments have been made since that date.[16] All of the seven who remained in the employ of the Council had made contributions to the superannuation fund (to which the Council also contributed) and were entitled to withdrawals from the fund and to various other benefits as well.
In summary, the claims are founded upon the declarations contained in S. 2429 as quoted in finding 2 (c), and upon the further ground that in the words of the State Department report, “* * * these Americans in accepting employment with the Shanghai Municipal Council, were working for an institution, in the proper functioning of which this Government was interested and concerned.”
in. the issues
12. At the initial pretrial conference in this proceeding the parties agreed upon the following statement of the issues:
(1) Are there, or are there not, equitable considerations, within the meaning of section 2509 of title 28, *30 United States Code [citing Burkhardt, et al. v. United States, 113 C. Cls. 658], because of which the court should report to the Congress that certain amounts are equitably due from the United States to the claimants; and (2) if so, what are the amounts so due to the several plaintiffs P
XV. EXTRATERRITORIALITY
13. The unique character of the International Settlement at Shanghai as a body politic was a by-product of the legal and political anomaly known as extraterritoriality, which, in turn, was a diplomatic by-product of commercial relations between China and nations of the West, with Great Britain and the United States as its principal architects.
14. Barely a century has passed since contacts (commercial or cultural) between China and any of the nations of the West became general. European (Catholic) missionaries were in China between 1600 and 1800 and helped to acquaint the Chinese with Western science and religion and, by their writings, had spread some knowledge of China in Europe. The Chinese reaction to the missionaries has been aptly described as one of acquiescence rather than tolerance. The Chinese of the Manchu dynasty were not prepared even to acquiesce in the presence of European merchants, who were never permitted to penetrate the empire as the missionaries had done. The merchants gained almost no recognition until British arms forced the issue in a war with China in 1839-1842.
15. (a) Extraterritoriality was a natural consequence of the efforts to allay the tensions that had led to armed conflict between Britain and China. In the only Chinese port theretofore open to foreign merchants (Canton), the Europeans were confined to a small area, and were required to quit the continent altogether during part of each year. Chinese were forbidden to teach their language to foreigners. Business could be conducted only through an officially designated group of Chinese merchants. Chinese officialdom regarded all foreign envoys as bearers of tribute, and resolutely refused official intercourse on terms of equality with any representatives of foreign nations. There were no fixed tariff charges, and the exactions of petty officials were often venal.
*31 (b) Chinese law emphasized group responsibility. The entire British community at Canton was held liable for the misdemeanor of any of its members. In death cases, even when the death had been accidental, the Chinese insisted upon a life for a life. All Westerners were subject to Chinese law and Chinese courts.
(c) The Europeans were equally incomprehensible to the Chinese. When the Manchu Emperor was finally frightened into making concessions to Western trade, the suggestions put forward by the British (and soon afterward by the Americans) for extraterritorial rights on the soil of China were received with equanimity born of relief. As one writer has expressed it:[17]
To the Manchu authorities who had bitterly resisted the trade assaults of the West, this extraterritorial scheme was not unwelcome; once commercial relations had been forced on them it was better that the tumultuous and incomprehensible barbarians should be remitted to the discipline of their own authorities with whom alone would lie the blame for failure to pacify them * * *.
16. (a) The Treaty of Nanking, dated August 29, 1842, between Great Britain and China, provided (1) for the cession of the island of Hongkong to the British; (2) for the opening to foreign residence and commerce of the ports of Canton, Amoy, Foochow, Ningpo, and Shanghai; (3) for liberty to appoint consuls at each port; (4) for communications between British and Chinese officials of the same rank on the basis of equality; and (5) for a “fair and regular tariff.” The rudiments of extraterritoriality were first expressed in a supplementary treaty in 1843.
(b) Similar trade treaties were made by China with the United States and with France in 1844. The American treaty (dated July 3,1844) was negotiated by Caleb Cushing as the American Commissioner. Whereas the conflict between Britain and China had been precipitated by Chinese measures to stop the importation of opium into China by the British, Cushing agreed that United States protection should be withheld from American citizens engaging in the opium traffic. In return the Chinese made further con *32 cessions to the Americans in the extension of extraterritoriality than had been given to the British. The benefit of concessions to one, however, redounded to all thi’ongh the inclusion in the several treaties (with Britain, the United States, France, and, a few years later, with Belgium and Sweden) of the most-favored-nation clause.
(c) The Sino-American Treaty of July 3, 1844, elaborated the theme of equality and reciprocal respect, required the Chinese local authorities to protect American citizens “from all insult or injury of any sort on the part of the Chinese,” and provided:
* * * Subjects of China who may be guilty of any criminal act towards citizens of the United States, shall be arrested and punished by the Chinese authorities according to the laws of China; and citizens of the United States, who may commit any crime in China, shall be subject to be tried and punished only by the consul, or other public functionary of the United States, thereto authorized according to the laws of the United States. S* $
* * * All questions in regard to rights, whether of property or person, arising between citizens of the United States in China, shall be subject to the jurisdiction and regulated by the authorities of their own Government. And all controversies occurring in China between citizens of the United States and the subjects of any other Government, shall be regulated by the treaties existing between the United States and such Governments, respectively, without interference on the part of China.
17. Foreign merchants promptly moved into the treaty ports and began the extension of trade with the Chinese. Inevitably, frictions developed. ^Representatives of the Treaty Powers felt that the Chinese were not abiding by their undertakings. The Chinese (especially the Manchu officialdom) considered the demands of the foreigners excessive. Moreover, Chinese tradition against receiving or treating foreigners as equals was stubbornly ingrained. Fifteen years after the first application of force, the British (joined this time by the French) again resorted to arms. When the Manchus again capitulated, a new series of treaties followed, in much the same mold as the former agreements albeit with additional strength to commit the Chinese to their under *33 takings. The two series of treaties (1842-1844 and 1856-1860) formed the foundation of commercial relations between China and the nations of the West for 100 years after the first treaties were made.
18. Foreigners residing in the several treaty ports lived in areas usually set apart as Concessions,[18] although in Shanghai and in Amoy the foreign residence quarters evolved as Settlements.[19] In either type of community Chinese jurisdiction [20] was in large measure ousted in favor of the laws of one or another foreign nation.[21]
19. The number of foreigners living in China continued to grow, and as their interests expanded they appeared to the Chinese to be increasingly aggressive. The native resentment of the presence of the foreigners and of their impact on the old order culminated in the violence of the Boxer uprising which, in 1900, precipitated the further use of foreign arms against the Chinese. In the aftermath of these disorders the United States inaugurated and obtained the agreement of the Treaty Powers[22] to the policy of the Open Door. In the negotiations with China the representatives of the Manchus specifically identified extraterritoriality as one of the objectionable features of the residence of foreigners on Chinese soil. They were pointedly reminded of the deficiencies (from the Western point of view) of Chinese law and the administration of justice under it. The subject was officially noticed in the Treaty of October 8, 1903, between the United States and China, in the following provision:
The Government of China having expressed a strong desire to reform its judicial system and to bring it into *34 accord with, that of Western nations, the United States agrees to give every assistance to such reform and will also be prepared to relinquish extraterritorial rights when satisfied that the state of the Chinese laws, the arrangements for their administration, and other considerations'warrant it in so doing.
20. (a) After the close of World War I the United States succeeded in having the twin principles of its policy toward China written into the Nine-Power Treaty of February 6, 1922. The signatories, other than China, agreed to respect the sovereignty, the independence, and the territorial and administrative integrity of China, and to uphold the principle of the Open Door.[23]
By resolution the Washington Conference (1922) expressed the sympathy of the Powers with China’s desire to see removed “immediately or as soon as circumstances will permit existing limitations upon China’s political, jurisdictional and administrative freedom,” and provided for the establishment of a commission to inquire into the practice of extraterritoriality in China and the progress in judicial reforms.[24]
(b) In 1926 the Extraterritoriality Commission examined the practices of extraterritorial jurisdiction in China and reported to the Treaty Powers that China’s jurisdiction had not improved to the pitch that would warrant their relinquishment of extraterritorial rights.
(c) Later the same year (1926) the British Government addressed to the Washington Treaty Powers a memorandum concerning policies toward China. The American Government found the memorandum to be in close accord with its general policy toward China, and the Secretary of State declared in a formal statement that “the Government of the United States * * * is ready now to continue the negotiations on the entire subject of the tariff and extraterritoriality * *
*35 21. (a) The Nationalist Government of Chiang Kai-shek continued to seek emancipation from the “unequal treaties.” Some progress was made in the period 1928-1930.[25] In 1929-1930 the British returned to Chinese administration their concessions in Chinkiang and Amoy. Meanwhile, Belgium had consented to the cancellation of her concession in Tientsin. Several of the smaller Powers assented to the jurisdiction of Chinese laws and courts over their citizens.
(b) In December 1929, the Nationalist Government announced that extraterritoriality would come to an end on January 1, 1930. Thereafter the effective date was postponed to January 1, 1932, by which time regulations had been framed providing for the trial of cases involving foreigners. The plan was not carried out because of the Japanese invasion of Manchuria in 1931.[26]
(c) In the course of the life and death struggle between China and Japan following the extension of hostilities by the Japanese in 1937, the Nationalist Government of China was forced to abandon Nanking and establish its base at Chunking. This was its capital when Japan cast her lot with the Axis Powers through her attack on Pearl Harbor. China’s participation in World War II was as one of the Allied Nations opposed to the Axis.[27]
22. (a) On May 24, 1943, the President of the United States proclaimed a “Treaty between the United States of America and the Republic of China for the Relinquishment of Extraterritorial Rights in China and the Regulation of Related Matters.” This treaty contained the following provision :
All those provisions of treaties or agreements in force between the United States * * * and * * * China which authorize the Government of the United States * * * or its representatives to exercise jurisdiction over *36 nationals of the United States * * * in the territory of the Republic of China are hereby abrogated. Nationals of the United States * * * in such territory shall be subject to the jurisdiction of the Government of * * * China in accordance with the principles of international law and practice.
(b) The foregoing treaty was signed on January 11,1943. On the same day there was signed a treaty between Britain and China which contained a provision identical to the one quoted above, subject only to the substitution of Britain for the United States.
V. THE INTERNATIONAL SETTLEMENT AT SHANGHAI
23. The British and American treaties of relinquishment contained the following provisions (substituting, of course, the name of Britain for that of the United States):
The Government of the United States * * * considers that the International Settlements at Shanghai and Amoy should revert to the administration and control * * * of the Republic of China and agrees that the rights accorded to the * * * United States * * * in relation to those Settlements shall cease.
The Government of the United States * * * will cooperate with the Government of * * * China for the reaching of any necessary agreements with other governments concerned for the transfer to the Government of * * * China of the administration and control of the International Settlements at Shanghai and Amoy * * *.
24. (a) When these treaties of relinquishment were signed (in January 1943), Japan was still in control of a large part of China, including the Shanghai area. The Allied Nations had only recently wrested the offensive from Japan in the Far East. The United States, with British concurrence, was promoting the recognition of China as one of the Big Four.
(b) Two and one-half years later (in September 1945), Japan surrendered. With the liberation of China from the forces of Japan, the International Settlement at Shanghai passed to the Government of the Republic of China. Through the transfer China gained control of a metropolis recognized as one of the world’s cosmopolitan centers, standing on land which, only a century before, had been rural mudflats outside the Chinese city of Shanghai.
*37 25. Following are excerpts from the 1930 Surrey of American Foreign Relations:[28]
* * * Some of the most important trading communities in China are imder the control and administration of foreigners. Save for the International Settlement at Amoy (and of course the Legation Quarter in Peking), however, the United States is interested only in the governance of the International Settlement of Shanghai, which has grown into a huge and complicated municipality whose future constitutes a special problem of major proportions.
To the foreign trader in China it is an islet of security in a tumultuous ocean of Chinese trouble — an islet which puts at his service modern granite buildings, electric lighting, factories and warehouses, telephone service, personal security and traffic control, luxurious western hotels, clubs in the English fashion — in short, all the paraphernalia of “civilization.”
* * * The inhabitants of the foreign settlement itself — 802,700 Chinese today and only 30,565 foreigners— are crowded within limits of eight and two-thirds square miles. Around the foreign settlement cluster Chinese-administered communities * * * and the old Chinese city — all nourished on Shanghai trade. A fair estimate of the Chinese population of “Greater Shanghai” would exceed two and one-half million. * * *
* * * The old trading post, in short, is the laboratory of modern China, in which all the industrial and scientific ideas of the West are tested and then passed on to interior China. * * *
26. Long before foreigners established their “trading post” nearby, the Chinese city of Shanghai was an important center for domestic trade, coastal and inland. When the port was opened to foreign trade by treaty in 1843, a population of some 270,000 Chinese lived in the inner city (surrounded by high walls and ramparts) and its extensive suburbs. Foreigners were not admitted to these areas. They were remitted to the adjacent rural areas.
27. (a) British (and soon afterward, American) merchants were permitted by the Chinese authorities to acquire *38 land within a limited area by purchase from the peasants and to hold it as by lease from the Emperor.[29]
(b) No specific provision for these arrangements was contained in any of the treaties, British or American. Instead, the arrangements were developed by negotiation between the Western Consuls (with the aid from time to time of their Ministers) and the Chinese Tao tai (superintendent of customs). Their somewhat sketchy (and always halting) agreements were incorporated in proclamations which were made simultaneously rather than jointly and which were known as Land [Regulations.
(c) As time passed there evolved a modus vivendi between the foreigners living in the International Settlement at Shanghai and their Chinese neighbors. Their adjustments to each other were tempered by the vicissitudes of repeated civil disorders in China. The Chinese Government was obligated by its treaties to protect the foreigners from violence at the hands of Chinese. The inability of the Chinese Government to control its own people on various occasions, and the recognized resourcefulness of the foreigners in protecting themselves were important factors in the evolution of the modus vivendi which underlay the development and growth of the International Settlement.[30]
VI. THE SHANGHAI MUNICIPAL COUNCIL
28. As pointed out by the 1930 Survey of American Foreign Belations:[31]
* * * [The] * * * administrative development [of the International Settlement] has kept pace with its physical growth. * * * Over Shanghai’s activities presides a Municipal Council which in 1929 spent about seven million dollars on administration. * * *
29. (a) Out of the Land [Regulations and the underlying features of the modus vivendi between the foreigners and the *39 Chinese there emerged what has been described as the “municipal constitution” of the Settlement. In spite of unorthodox methods by which some of the foundation stones were hewn, the foundation proved steady and the edifice erected upon it was sturdy.[32]
(b) Characteristics of the Shanghai Muncipal Council pertinent to this proceeding include the following:
(1) The Council was (within the limitations of the “municipal constitution”) the governing body of the Settlement.
(2) It was the owning entity of the municipality, holding, as such, extensive assets in land, buildings, facilities, securities, and cash.[33]
(3) As the governing body (within the limitations mentioned above) it had the power to levy and collect taxes.
(4) It had recognized authority to enter into contracts, and was the employer (through employment contracts hereinafter described) of the plaintiffs.
(5) Subject to the jurisdictional complexities of extraterritorial and mixed courts, the Council could sue and be sued.[34]
30. The following excerpts from the 1930 Survey of American Foreign Belations are illustrative of the operation and growth of the Shanghai Municipal Council during the earlier part of the period that is material to this proceeding:[35]
[During a period prior to 1920]
*40 * * * Ratepayers’ meetings went unattended and the multitudinous affairs of the Municipal Council were left in the hands of a ramified, capable, and honest bureaucracy, of which the municipal departments are under British management, and nine-tenths of the employees, excluding the police force, are British. * * *
* * * One of the results of the Nationalist agitation against foreign privileges was the opening to the Chinese of the portals of the Municipal Council. * * * In 1925 there were 2742 ratepayers — 1157 British, 552 Japanese, 328 American * * *. Up to 1928, the Council consisted of nine members, of whom five were British, two Americans, and two Japanese, with no Chinese. In * * * 1928 * * * an arrangement was made for the election of three Chinese to the Council * **.*** [B]y the * * * vote of a meeting of May 2, 1930, * * * the Chinese membership will be five to the British six, with one American and two Japanese.
In 1929, Sterling Fessenden, an American, who had been the chairman of the Council since 1923, was appointed director-general. His appointment was part of the program for renovating the administration in accord with the new spirit of cooperation with the Chinese * * *. * * * Shanghai had begun to think in terms of the future rather than of the present * * *. The Municipal Council has become apprehensive of the possible results of the abolition of extraterritoriality upon the Government of the International Settlement * * *.
* * * Shanghai, after all, is the heart of the whole system by which a great part of China exchanges its products with the rest of the world. By stopping that heart the trade of China would be paralyzed. As long as the rest of China is a political quicksand, Shanghai is the only financial anchorage for the Government against the rapacity of contending armies, and it is significant that the Central Bank of China keeps the Government’s silver reserves in the International Settlement. * * *
VII. TERMS AND CONDITIONS OF SERVICE
31. (a) By virtue of the nature of the International Settlement many non-Chinese employees were deemed by the Council to be requisite to the needs of municipal functions. Westerners (Englishmen, in particular, and Americans) were desired in substantial numbers.[36] In order to recruit *41 and hold the desired quota of foreign employees the Council began, many years prior to World War II, the development of a stable merit system of employment. At the times material to this action the Council’s contracts of employment included provisions for many privileges and benefits in addition to wages and salaries, all designed to make municipal employment attractive and to provide incentive for tenure and promotion.
(b) Prior to December 31, 1930, the salient features of the terms and conditions of employment were set forth in a printed form of Agreement, on which all necessary data were inserted to complete a specific contract of employment with each employee. During the year 1931 the several Agreements were superseded by Letters of Appointment, to which were attached in booklet form the Terms and Conditions of Service. All contracts of employment, whether by Agreement or Letter of Appointment, were periodically reviewed and (as far as material here) renewed by the Council to maintain their currency.
(c) The Terms and Conditions of Service were revised by the Council on March 24,1937, effective July 1,1937, and again on May 1, 1941. Pertinent features of the method of appointment and of the terms and conditions of service as revised on March 24, 1937, are set forth in the findings immediately following.[37]
32. (a) Employment was by Letter of Appointment, which was directed by the Council to the employee, who by his signature agreed “to accept the * * * appointment under the * * * Terms and Conditions of Service * * * as attached * * The Letter of Appointment specified the position and its classification, the date of appointment, the salary “per mensem,” and the grade of the “Grading Scales.”
(b) Following are pertinent excerpts from the Terms and Conditions of Service:
Classes of Appointment. There shall be three classes of appointment under Letter of Appointment designated Classification “A,” “B” and “L” respectively.
*42 Promotion. Promotion will be in accordance with the grading scales * * * and will depend upon vacancies m higher positions and the ability, energy and conduct of the employee. * * *
Long Service Increase. The Scales of Pay for certain grades provide for a Long Service Increase when no promotion to a higher grade occurs after six years’ service on the maximum pay for the grade. * * *
Personal Reports. The Council requires that personal reports be kept and that each year such reports be made to the Heads of Departments in regard to the ability, efficiency and energy of every employee * * *. sfc if: *
Municipal Holidays. The following holidays are adopted by the Council and may be granted at the discretion of Heads of Departments. * * * [Total of 17 days listed.]
Medical Benefits. Medical attendance and benefits will be provided in accordance with the rules contained in Appendix I for the employee, his wife and not more than two children * * *.
Long Leave. Long leave will be granted to Foreign employees serving under Letters of Appointment provided that the exigencies of the Service permit * * *. * * * (a) For employees classified as “A”; for employees who on June 30, 1937, are Class “A” and for Class 4$L” employees engaged from abroad prior to January 1,1937, seven months’ leave on full pay will be granted after five years’ active service in Shanghai. * * *
* * * Upon termination of service after [stated terms] * * * leave pay will be granted for the number of weeks standing to an employee’s credit towards long leave. * * *
* * * Passages will be provided on long leave for foreign employees * * *.
Annual Short Leave. • The following conditions will apply in regard to the grant of Annual Short Leave * * * * * *
Superannuation Fund. The salary paid by the Council shall be subject to a deduction in the case of every monthly payment of 5 per cent thereof, being the employee’s contribution to the Superannuation Fund, subject to the rules governing the * * * Fund contained in Appendix VI.
Sick Leave and Invaliding. * * *
Pay and Repatriation Pay. The salaries of employees are issuable at the rates shown in the respective grades in the Grading Scales. The salaries [in posts] classified “A” and “B” consist of six-sevenths Pay and *43 one-seventh Repatriation Pay. Repatriation Pay is issuable to foreign employees only. * * *
Invaliding. * * *
Retirement and Pension. Retirement under pension shall be in accordance with and subject to the conditions contained in Appendix V. * * *
33. Following are pertinent excerpts from Appendix V of the Terms and Conditions of Service, relating to “Retirement and Pension”:
* * * The general principle regarding pensions is retirement on half pay subject to the following rules. Only continuous service under Letter of Appointment or under Agreement which was substituted by Letter of Appointment counts toward qualifying service for pension:
* * * The qualifications for maximum pension are 20 years’ continuous service and 55 years of age. Retirement shall be compulsory unless in the Council’s opinion exceptional circumstances warrant the retention of the employee’s services.
* * * The qualifications for minimum pension are 20 years’ continuous service and 50 years of age. With the Council’s approval employees have the option of retiring under this clause * * *. * * *
* * * The pension scheme is on a local currency basis and the computation will be made as follows:
(a) Maximum Pension. — The difference in local currency between the income derivable from the employee’s Superannuation Fund assessed at 5 per cent per annum and half of the salary drawn at date of retirement shall form the maximum pension, subject to the limit imposed by rule 5 (f) hereof.
(b) Minimum Pension. — A deduction of 1 per cent to be made for each year of age shortage reducing the basis of computation from half of final salary at the age of 55 to 45 per cent of final salary at the age of 50, the difference between which and the assessed income derivable from the employee’s Superannuation Fund assessed at 5 per cent per annum shall form the minimum pension, subject to the limit imposed by rule 5 (f) hereof.
(c) Salary at Date of Retirement. — The salary drawn at the date of retirement to comprise the employee’s actual basic salary and assessed emoluments provided under the general grading scheme. * * *
(e) Rate of Exchange. — Foreign Pensionnaires other than those who at the date of retirement are classified “L” will be given the option of receiving their local *44 currency pensions either in local currency or in Sterling at the rate of Is. 2% d. to the dollar, in IT. S. dollars at the rate of 29% to $100, or in Yen at the rate of 102% to $100, such option to be exercised at date of retirement and once taken will be irrevocable.
Employees who on June 30, 1937 are classified as “A” will be given the option at date of retirement of electing to receive at the rate of Is. 9% d. to the dollar (2s. 6d. to the Tael) that portion of their local currency pension which corresponds to their total service under Letter of Appointment or Agreement which has already been served prior to July 1,1937.
(f) Maximum Pension. — In respect of employees who on June 30, 1937 are classified as “A” no pension shall exceed $8,350 or £500. In the case of other employees the maximum pension will be $8,350 and such employees will not be permitted to convert their pensions into an alternative currency at a higher rate than * * * set out * * * [above].
Pensions will be paid quarterly in arrears in accordance with the option exercised. If in Sterling, IT. S. Dollars or Yen by demand draft or cheque on London, New York and Tokyo, respectively; if in local currency, by cheque on the Council’s bankers. * * *
34. (a) Following are pertinent excerpts from Appendix VI of the Terms and Conditions of Service, pertaining to “The Superannuation Fund”:
* * * A contribution shall be made to the Fund by every employee * * * of 5 per cent of the monthly salary due to the employee, and the Council will deduct such contribution from such salary and pay it into the Fund.
* * * [0]nly basic pay * * * is computable for superannuation benefits.
* * * For every such sum contributed by such employee, the Council will pay into the fund a contribution equal to twice the employee’s contribution save that in respect of appointments made on and after January 21,1937, the Council’s contribution shall during the first 5 years’ service be limited to 5 per cent of an employee’s basic pay * * *.
* * * The sums so contributed shall accumulate at compound interest, calculated half-yearly * * *, the rate of interest being the average yield in the previous year on the investments of the Local Currency and several Alternative Currency (Sterling, IT. S. Dollars and Yen) funds respectively. * * *
*45 * * * The Council will cause accounts to be kept of the amounts contributed by each employee and of the Council’s contribution in respect thereof and of all interest added thereto. * * *
* * * Kefunding of Contributions. * * * The sums contributed by the employee with interest accumulated thereon shall be payable to the employee on leaving the Service * * *.
* * * The sums contributed by the Council and the employee with interest accumulated thereon shall be payable to the employee:
1. On leaving the Service with the Council’s approval and consent after at least three years’ service * *' *.
2. On becoming unfit for service on account of ill health or accident * * *.
3. On decease * * * payment will be made to the * * * personal representative * * *.
4. In * * * special circumstances * * *.
* * * Withdrawals of Superannuation on termination of service in respect of foreign employees who were in Class “A” prior to July 1,193?, and who upon retirement have completed at least six years’ satisfactory service will be assessed in respect of one-half of that part of the fund standing to their credit on June 30, 1931, with interest accumulated thereon up to the date of withdrawal at Is. 9V2 d. to the dollar (2s. 6d. to the Tael). * * *
* * * Save as hereinbefore stated the provisions of this rule will not apply to sums paid into the Fund after June 30,1937.
Note. — One-half of the payment will be made in Local Currency without any exchange compensation thereon, and the balance will be paid by demand draft or cheque * * * at the rate of Is. 9y2d. to the dollar (2s. 6d. to the Tael) or may be issued in the Council’s discretion in Local Currency in which case the Hongkong & Shanghai Banking Corporation’s opening mai'ket rate of exchange for the day payment is made will be taken for the purpose of computing the amount of exchange compensation due to the employee.
(b) In the 1941 revision of the Terms and Conditions of Service there was substituted for the paragraph immediately preceding, the following:
* * * In respect of foreign employees of all classifications who upon retirement have completed at least three years satisfactory service * * * withdrawals will, at the employee’s option, be assessed, in the case of *46 American employees, at the rate of not less than U. S. $24% to $100 when the U. S. dollar exchange is below that rate; in the case of Japanese employees, at the rate of not less than Yen 86 to $100 when the Yen exchange is below that rate; and in the case of other foreign employees, at the rate of not less than 1 /- to the dollar when the sterling exchange is below that rate. * * *
* * * Payment will be made in the Council’s discretion either in the alternative currency applicable or in local currency.
N. B. If and when exchange rises to the rate of 1 /- to the dollar, or U. S. $24% to $100, or Yen 86 to $100, and free conversion into the applicable alternative currency is practicable, this rule will be cancelled without further notice. * * *
VIII. CURRENCY AND EXCHANGE; INFLATION
35. In the course of negotiations to settle the claims of the Council’s employees,[38] controversy arose over the meaning of the Council’s 1941 provision for payment of superannuation withdrawals “either in the alternative currency applicable or in local currency” at the Council’s discretion. The Chinese demanded strict and literal interpretation and application of the provision. The representatives of the Treaty Powers contended that the 1941 provision should be read in the light of its 1937 antecedents. The stake in the controversy was the burden of inflation, and who should bear it.
36. (a) When the Shanghai Municipal Council revised its Terms and Conditions of Service in March 1937, Chinese currency and the rates for exchanging it into sterling, dollars, and yen were relatively stable.
(b) Japan had invaded Manchuria in 1931, but the conflict was essentially a localized affair which did not involve a national effort on the part of China. However, when Japan extended the conflict in July 1937 to encompass the conquest of all China, the Chinese economy was from that time forward subjected to the strain of a life or death struggle.
(c) By 1939, inflation had so infected the Chinese currency that the Shanghai Municipal Council found it neces *47 sary to supplement tlie wages and salaries of municipal employees with, extra allowances for the cost of living. By 1940 these allowances exceeded 100 percent of the base pay.[39]
(d) In spite of the weakening of the Chinese currency the Shanghai Municipal Council met its commitments in foreign exchange, paying sterling, dollars, and yen as required. By 1940 the cash position of the Council was impaired to an extent indicating the necessity for unusual measures to tide over the emergency. The Council tried, unsuccessfully, to borrow money from the United States. Ultimately, the crisis was solved locally, and in 1941 the Council reported a small surplus.[40]
' 37. (a) Whereas the Shanghai Municipal Council, in its Terms and Conditions of Service as amended to May 1,1941, committed itself to dollar exchange at the rate of US$24% to CN$100 (almostUS$l to CN$4)[41] the official rate of conversion a year later had fallen to US$5.2813 to CN$100 (almost US$1 to CN$20).
(b) In July 1942, the official rate of exchange became US$1 to CN$20. This rate was continued in effect until June 1944, and, after some fluctuation, was restored, in August 1945 and continued until February 1946. Meanwhile, the black market quotations soared. At the end of 1945, exchange on the black market was CN$1,350 for US$1; and by the end of 1946 it was CN$6,450 to US$1. On August 19, 1948, the Chinese Government announced the conversion of Chinese National dollars to gold yuan at the rate of CN $3,000,000 to one.
(c) By the time Shanghai was liberated from the Japanese in September 1945, and at all times thereafter, the “official rate” of conversion of Chinese dollars into either sterling or United States dollars was, as to the employees of the Shanghai Municipal Council, no more than a euphemism.
*48 IX. TRANSFER OF THE INTERNATIONAL SETTLEMENT
38. The American Treaty of Relinquishment (proclaimed May 24, 1943) contained the following:[42]
* * * The Government of the United States * * * will cooperate with the Government of * * * China for the reaching of any necessary agreements with other governments concerned for the transfer to the Government of * * * China of the administration and control of the International Settlements at Shanghai and Amoy, including the official assets and the official obligations of those Settlements, it being mutually understood that the Government of :|: * * China in taking over administration and control of those Settlements will make provision for the assumption and discharge of the official obligations and liabilities of those Settlements and for the recognition and protection of all legitimate rights therein. * * *
39. As noted in finding 24, the American and British treaties were signed just after the Allied Nations gained the offensive in the Far East and as part of the American effort to raise China to eminence as one of the Great Powers. Two and one-half years were to pass before the rendition of the International Settlement at Shanghai could be accomplished in fact.
40. On September 30, 1945, the Republic of China, with American and British concurrence, formally assumed responsibility for the administration and control of the International Settlement at Shanghai.[43]
41. The Shanghai Municipal Council had been replaced, in 1943, by a Japanese puppet regime.[44] It was never reconstituted by the Chinese Government after the control of the International Settlement passed to China.
*49 X. THE UQUIDATION COMMISSION
42. After the transfer of the administration and control of the International Settlement to the Government of China, diplomatic exchanges were made between the United States and China and between Great Britain and China regarding the discharge by China of the obligations of the former Shanghai Municipal Council. An understanding was reached pursuant to which the Chinese Government in 1946 appointed a Liquidation Commission, consisting of eight Chinese, to determine and assess the official assets and obligations of the former Shanghai Municipal Council, including specifically its obligations to its former employees. Attached to the Liquidation Commission were four Foreign Advisers, representing respectively the Governments of the United States,[45] Great Britain, Switzerland, and The Netherlands.
43. The Liquidation Commission, as its first step, appointed a subcommittee to assess and determine the rights and interests of the employees of the former Council and to make recommendations thereon to the Commission. The eight members of the subcommittee consisted of the four Foreign Advisers and four Chinese.[46] These men began their deliberations in November 1946. Differences arose immediately.
44. At the outset the members of the subcommittee disagreed as to the cutoff date for determining the Council’s obligations to its employees. The Foreign Advisers urged the transfer date of September 80, 1945, as marking the end of the Council’s obligations. The Chinese members insisted upon using December 7, 1941, since Shanghai was under the control of the Japanese on and after December 8, 1941.
45. When deadlock over the cutoff date became apparent, the Foreign Advisers advanced a proposal (designed to re *50 lieve the immediate financial hardship of the employees and to test the sincerity of Chinese) to recommend a provisional payment of superannuation and pension benefits ascertainable as at December 8, 1941, without prejudice to ultimate determination of the final cutoff date. The Chinese members of the subcommittee agreed to the proposal,[47] and an appropriate resolution of recommendation to the Liquidation Commission was unanimously adopted.
46. (a) The resolution of the subcommittee contained the following:
Foreign currency: Payments due in foreign currency or in Chinese currency convertible to foreign currency at rates of exchange specified in the Terms of Service of the former Shanghai Municipal Council shall be paid in foreign currency.
(b) When the subcommittee’s resolution came before the Liquidation Commission, one of the (Chinese) members proposed and the Commission adopted the following amendment of the foregoing provision:
Payments due in foreign currency shall be paid in foreign currency. Payments due in Chinese currency convertible to foreign currency shall be paid at the discretion of the Chinese Government either in the alternative currency applicable or in Chinese currency.
47. (a) The effect of the Commission’s amendment of the subcommittee’s resolution was, of course, immediately apparent to the Foreign Advisers. The change meant that employees entitled to foreign currency payments (by way of Chinese currency convertible to foreign currency[48] as distinguished from payments outright in foreign currency) would receive Chinese currency which they could convert only at ruinous rates in the black market.
*51 (b) Tbe Foreign Advisers recorded tlieir dissent by saying: “It is hoped and believed by the Advisers that such a shockingly unjust settlement of this obligation by payment in local currency is not really intended by the Chinese Government.” The Chairman of the Liquidation Commission [49] then promised to use his personal influence to persuade the Chinese Government to provide the requisite foreign exchange.
48. (a) Complete deadlock ensued within six months after the deliberations of the Liquidation Commission were begun. No agreement was reached between the Chinese members and the Foreign Advisers as to either point in dispute: the cutoff date or the foreign currency payments.
(b) They did agree to refer both points to Nanking for diplomatic consideration, the Chinese reporting to their Government and the Foreign Advisers reporting to their respective Ministers.[50] Keports were made accordingly, but nothing ever came of such diplomatic exchanges as may have been based upon them.
XI. THE MORCHER DOCUMENT
49. Meanwhile, a separate determination of the obligations of the former Shanghai Municipal Council to its employees was made in a study and compilation financed by the British Government. The undertaking was directed by the men who had been the last members of the Council. The work was done under the supervision of the last treasurer of the Council, J. Y. Morcher, whose name identifies the resulting Morcher Document. A staff of 20 former employees of the Council participated in the work, which required some eight months. Participants included the 1941 chairman of the Council and the 1940-41 chairman of its Staff Committee.
50. (a) The completed Morcher Document contained tabulations of the accounts of thousands of the Council’s former employees, of many nationalities, and included detailed calculations of the obligations of the Council (as determined by the staff) to the employees, including the plaintiffs in this proceeding.
*52 (b) Th.8 Morcher Document was available to the Foreign Advisers, who predicated their recommendations to their respective Ministers upon its contents.
XII. THE FOREIGN ADVISERS’ RECOMMENDATIONS
51. The formal, detailed recommendations of the Foreign Advisers were contained in a set of resolutions adopted by them on June 25, 1947, and submitted to the Liquidation Commission with a supporting memorandum (dated July 1, 1947).[51]
52. The resolutions declared:
(1) That the liabilities of the Council to its employees should be assessed as the total of rights and benefits due under their contracts of employment.[52]
(2) That “* * * the sums due to employees shall be deemed to be exactly those sums and the currencies thereof * * * specified in the Morcher Document, save only that they may be modified by these Resolutions.”[53]
(3) That “interest on all sums due to employees shall be payable at the rate of 5% per annum up to the date of final settlement * * * [and] * * * Interest due on * * * obligations * * * assessed in foreign currency in the Morcher Document or in these Resolutions, shall be payable in such foreign currency.”
(4) That employees who left the service of the Council prior to December 8, 1941, should be paid the pensions due them, with interest on arrears, plus fringe benefits unsettled on December 8, 1941.
(5) That the liabilities to employees in the service on December 8, 1941, should be assessed on the assumed basis of continuous employment up to September 30,1945.
(6)1 That the obligations to employees (in service on December 8', 1941) should include (in addition to pay during *53 internment, covered above) : (a) compensation for loss of employment “as provided for in the Morcher Document and as herein laid down;” (b) passage allowances, in full for the employee and his wife, with half fare for children (passage for American nationals to be assessed at US$350); (c) medical attendance benefits to those employees who were interned by the Japanese (assessed, for American nationals, at US$72 for the employee, his wife, and “not more than two children”) ; and (d)l disability gratuities and pensions in respect of disablement.
(7) That the obligations to employees whose services terminated before December 8, 1941 (pensioners) should include the duty of the Chinese Government “* * * to provide a fund in the requisite currencies in amounts sufficient for the discharge of all accrued and future liabilities for payment of such pensions * * * and interest [on arrears] * * *. The general practice of life insurance companies shall be followed in determining the amount of the pension fund * * *”[54]
53. The Foreign Advisers’ supporting memorandum set forth the general principles upon which their resolutions were based and analyzed, with illustrations, several of the specific problems for which solution had been sought and provided by them. In the memorandum the Foreign Advisers said:
* * * We feel satisfied * * * that * * * the Mor-cher Document truly represents the practice of the former S. M. C. * * *
* * * The general principles [of our resolutions] reflect our belief in continuous * * * liability ixp to 30.9.45 % Ht #
The vast majority of employees joined the S. M. C. in reasonable expectation of making their careers in the service of the Municipality. * * * [T]hese expectations were shared by the S. M. C. itself.
* * * We hold it to be a reasonable presumption that, had the Shanghai Municipal Council resumed the Government of the International Settlement, it would have required all the members of its own Staff to continue in its service at the end of the war. Moreover, if, upon *54 transfer of Government to a new authority, the employees were not to be retained in Municipal employment, we are convinced that the S. M. C. would have compensated them for the loss of their careers. We do not believe that the employees are entitled to less consideration than they would have received had the Relinquishment Treaties not been made. We believe, therefore, that the “official obligations and liabilities of the Settlement”, within the meaning of these words in the Treaties, must be taken as including all such monetary compensation as it may be reasonably assumed the 8. M. C. would have made to members of its Staff, had it resumed government of the Settlement.
It is our opinion, therefore, that * * * if the S. M. C. had had the authority and opportunity to liquidate its liabilities to its employees itself, prior to handing over its assets and responsibilities to its successor, the final settlement would not have been less favourable to the employees than that which our Resolutions propose, and that it might well have been more favourable. * * *
XIII. THE BRITISH SETTLEMENT
54. (a) As early as 1943 the British Government undertook to make advances on account of pensions due from the Shanghai Municipal Council to British subjects not in enemy territory.[55] These advances were made to relieve hardship.
(b) In 1946, the British Government extended the scope of these relief payments to cover advances to British employees of the Council who were not pensioners but who had claims to payments (withdrawals) from the superannuation fund.
(c) In 1949, the British Government adopted a broader scheme (hereinafter more fully described) of ex gratia payments to all British ex-employees of the Council who derived their nationality from the United Kingdom.
(d) No specific Act of Parliament was required to initiate any of the foregoing measures. Each step, however, has *55 required annual appropriations, wbieb have been regularly-provided.[56] As of 1953, approximately 550 persons were receiving advances against retirement benefits, to the extent of £50 to £55 thousand annually. Total payments were in excess of £1 million.
55. (a) On November 22, 1949, notices were mailed[57] to potential claimants under the British scheme of ex gratia. payments setting forth details of the payments “which will be final so far as His Majesty’s Government in the United Kingdom are concerned * *
(b) Included with the notices were forms for (1) declaration of claim by the ex-employee, (2) deed of assignment providing subrogation of the British Government as claimant against the Government of China, and (3) a statement of the Terms of Settlement.
56. (a) The Terms of Settlement recited that “under the terms of the Sino-British Treaty of 1943, it was understood that the Government of * * * China * * * would make provision for the * * * discharge of the * * * obligations of * * * [the International Settlement at Shanghai] that “no payments have been made by the Chinese Government * * and that “in order to relieve hardship, His Majesty’s Government * * * agree to make to ex-employees, who derive British nationality from the United Kingdom, or, in the event of their decease, their personal representatives (heirs or successors), the following final ex gratia payments.”
(b) The payments to be made included the following:
(1) Superannuation fund benefits. “A lump sum advance representing the full amount recommended by the Foreign advisers to the Shanghai Liquidation Commission in respect of superannuation fund benefits up to 30th September 1945, less advances in respect of superannuation fund benefits already made by His Majesty’s Government.”
(2) Gratuities for loss of employment. “A lump sum advance representing the full amount recommended by the Foreign Advisers * * * in respect of gratuity for loss of employment.”
*56 (3) Pay during internment. “A lump sum advance representing 50 per cent of tbe amount recommended by the Foreign Advisers * * * in respect of arrears of pay up to 30th September, 1945, less. * * * payments (if any) made by the Shanghai Municipal Council on or after 8th December 1941, at the rate of exchange approved by the Foreign Advisers to the Shanghai Liquidation Commission.”
(4) Pensions. “Quarterly advances representing the full amounts to which ex-employees * * *, or in the event of their decease, their personal representatives (heirs or successors), are entitled in respect of pensions (a) which were awarded prior 8th December 1941, [or] (b) to which ex-employees were held to be entitled by the Foreign Advisers * * * in respect of the period from 8th December, 1941, to 30th September 1945: or alternatively, a lump sum advance in commutation of pension in cases where quarterly payment is so small that it can be of little current value to the recipient.” Also, “additional advances, during the first year of operation of this settlement, to recipients of advances in respect of pensions, in order to adjust, where appropriate, the difference between the previous upper limit of £40 per month and the full amount of the pension.”
(c) Whereas the British Government had previously specified that advances by it to ex-employee-pensioners should not be subject to the British income tax, which provision was continued in the final settlement, the following modification was inserted:
Although no income tax is payable by pensioners of the former Municipal Council in respect of advances by His Majesty’s Government against pension rights, income tax will have to be paid m respect of current and past advances in respect of pension if the Chinese Government at any time in the future meet their obligations in regard to pensions for ex-employees of the Shanghai Municipal Council.
XIV. SUMMARY OP EMOLUMENTS
57. (a) Included in the claims of the ten plaintiffs in this proceeding are claims for the following items (presently listed and hereinafter more fully defined): pensions; pension fund; funding costs; superannuation; leave pay; gratu *57 ities; pay; medical expenses; travel allowances; and interest. In some instances certain “advances” have been deducted.
(b)While each of these items of claim had its roots in the emoluments of service as defined in the contracts of employment, the form in which the plaintiffs have presented them here was in every instance derived from (1) the computations of the Morcher Document, (2) the solutions proposed by the Foreign Advisers, or (3) the British Terms of Settlement.
58. (a) The Morcher Document[58] is not in evidence in this proceeding.[59] For computations from the document material to their claims, plaintiffs rely upon an “Extract from Schedule of * * * Benefits Compiled under the Terms of the Morcher Document in respect of American Nationals.” [60]
(b) The Foreign Advisers predicated all of their recommendations upon the methods used in the compilation of the Morcher Document,[61]- making some modifications of their own which required additional'computation's.[62]
(c) The British Terms of Settlement reflected selected items from the recommendations of the Foreign Advisers, subject to modification of the “pay” item and elimination of interest.
(d) In the absence of the Morcher Document computations, plaintiffs have derived their computations of both the Foreign Advisers’ recommendations and the British Terms *58 of Settlement from the extract (from the Morcher Document) available to them.
59. Except for the details of computations, the nature and content of the several items of claim are satisfactorily developed by the evidence. The various items are defined in outline in the findings next following.
60. (a) Pensions: Generally. The provision for pensions was derived directly from the Terms and Conditions of Service of the Shanghai Municipal Council.[63] The general principle was retirement on half pay at age 55 after 20 years’ service. The (maximum) pension was to consist of the “difference in local currency between the income derivable from the employee’s superannuation fund assessed at 5 per cent per annum and half of the salary drawn at the date of retirement.” In other words, the employee, upon retirement, would be paid the amount to his credit in the superannuation fund (his own and the Council’s contributions). It would be assumed that his return on this sum (after investment of it by him) would be at the rate of 5 percent per annum. Deducting the amount of the assumed return from one-half of the employee’s salary at the date of his retirement, the Council would, pay the difference as pension. Although this difference was determined in local currency, it was payable either in local currency or in foreign currency at fixed rates of exchange, at the option of the employee.
(b) Pensions: Retirement before December 8, 1941. As to employees retiring before December 8, 1941, determination of the amounts payable would have been made by the Council in regular course. This determination would have covered all questions of conversion and foreign exchange. The amounts so determined were payable quarterly, in arrears. The prewar pensioners would have received their withdrawals from the superannuation fund. Balances due them would therefore be the unpaid quarterly installments (after September 30, 1941, the date of the last regular payment by the Council). To these balances the Morcher Document would have added interest on the unpaid installments to September 30, 1945. The Foreign Advisers would have *59 continued interest to the date of payment. The British Terms of Settlement did not provide for interest. (Future installments of pensions were to be provided by funding, hereinafter discussed.)
(c) Pensions: Retirement after December 8, 1941. The Foreign Advisers recommended, and the British Terms of Settlement adopted, payment of pensions to employees who would have become entitled to them between December 8, 1941, and September 30,1945.
61. Pension fund; funding costs. Both of these terms have reference to the Foreign Advisers’ recommendation for “* * * a fund in the requisite currencies in amounts sufficient for the discharge of all * * * future liabilities for payment of * * * pensions” based on “the general practice of life insurance companies * * * .”[64] Plaintiffs, having adopted the pattern of the British Terms of Settlement for the payment of pensions to employees who would have become eligible therefor between December 8, 1941, and September 30, 1945, now ask that this device recommended by the Foreign Advisers be extended to cover two of their number who would have become so eligible.[65]
62. Superannuation benefits. This term (generally shortened to superannuation) refers to the rights of employees (other than employees who retired prior to December 8, 1941) to withdrawals from the superannuation fund of the contributions made to it by themselves and by the Council. The governing regulations were specifically set forth in the Council’s Terms and Conditions of Service.[66] The amounts were computed in the Morcher Document to September 30, 1945. The Foreign Advisers similarly recommended computation and payment to September 30, 1945, with interest thereafter until paid. The British Terms of Settlement implemented the Foreign Advisers’ recommendation, but without interest.
63. Leave pay. The Council’s Terms and Conditions of Service provided “long leave” for foreign employees,[67] sim *60 ilar to the “home leave” common to foreign service. The leave was to be with pay, pursuant to detailed regulations in Appendix III of the Terms and Conditions. Such leave pay was commuted in the Morcher Document. These computations were recommended by the Foreign Advisers, with the addition of interest from September 30, 1945. The British Terms of Settlement made no mention of leave pay.
64. Gratuities. As this item appears in these claims it was derived only indirectly from the Terms and Conditions of Service. The Council made provision for certain gratuities to widows and children and for payment of severance pay under stated conditions. The Morcher Document translated severance pay into a gratuity for loss of employment at rates comparable to the Council’s provision. The Foreign Advisers recommended the payment, and the British Terms of Settlement implemented the recommendation, albeit without the interest recommended by the Foreign Advisers.
65. Medical expenses. The Terms and Conditions of Service provided for medical expenses under stated conditions and for limited amounts. The Morcher Document made no commutation of these benefits. The Foreign Advisers, however, recommended commutation of the benefits, to be assessed for Americans at US$72 per capita for the employee, his wife, and not more than two children, and to be paid to those employees who were interned by the Japá-ñese.[68] No mention was made of medical expenses in the British Terms of Settlement.
66. Travel allowances. The Terms and Conditions of Service provided for “passage” money under a variety of conditions. No commutation of these benefits was made in the Morcher Document, but the Foreign Advisers recommended the commutation and payment at US$350 per capita for the employee and his wife, with half fare for children.[69] The British Terms of Settlement omitted travel allowances.
67. Interest. There was no occasion for provision of interest in the Terms and Conditions of Service.[70] The Morcher Document was predicated on a cutoff date (September 30, 1945). As far as can be determined from the *61 available evidence, interest was not included in any of its computations, except as to unpaid quarterly installments of pensions. The Foreign Advisers, on the other hand, recommended the payment of interest “on all sums due to employees * * * at the rate of 5% per annum * * * to the date of final settlement * * [71] The British Terms of
Settlement disregarded this recommendation.
68. Pay — less advances. The “pay” item in these claims has reference to the wages or salaries the employees would have received on the assumption that their employment was continuous between December 8, 1941, and September 30, 1945. Such “pay” was computed in the Morcher Document, and “advances” (pay actually received during that period) were deducted to arrive at the amount due.[72] The Foreign Advisers recommended the inclusion of such pay in the obligations to be discharged by the Government of China,[73] plus interest at 5 percent until paid. The British Terms of Settlement implemented the Foreign Advisers’ recommendation to the extent of “50 per cent of the amount recommended * * * less payments * * * made * * * on or after 8th December 1941, at the rate of exchange approved by the Foreign Advisers * * *.”
69. Bates of exchange, (a) The Terms and Conditions of Service established the rates of exchange applicable to the payment of pensions, superannuation benefits, and leave pay. The Morcher Document computations were so predicated, and both the Foreign Advisers and the British Terms of Settlement adopted these computations wherever applicable. .
(b) Medical benefits and travel allowances were computed by the Foreign Advisers in specific United States dollar equivalents.
(c) The interest payments recommended by the Foreign Advisers were to be paid (and therefore computed) in foreign currency if the interest was due on items similarly payable.
*62 (d) The evidence fails to explain the conversion basis used in determining the gratuities payable for loss of employment.
(e) Pay was computed at the rate of pay (in Chinese dollars) applicable in December 1941, and converted into sterling at the rate of 3%z d. to the Chinese dollar.
(f) Advances were computed in Chinese dollars and converted into sterling at the rate applicable on the date of payment of the advances.
(g) Sterling was converted into United States dollars at £1 to $4.025, the rate of exchange applicable on September 30,1945.
70. Defendant’s computations, (a) In addition to the three bases of claim upon which plaintiffs have relied in their presentation,[74] defendant has submitted separate computations of the plaintiffs’ claims.[75] Most of defendant’s computations were made in terms of Chinese dollars, which were then converted into United States dollars at the rate of CN$20 to US$1, the official rate of exchange on September 30,1945.[76]
(b) Except for two pensioners admitted to have been retired before December 7, 1941,[77] defendant’s computations relate only to (1) rights to withdrawals from the superannuation fund[78] and (2) the possible grant of pay during internment.
(c) Defendant’s computations took no cognizance of other emoluments claimed by plaintiffs: funding cost of future pension payments; pension payments to employees who became eligible therefor after December 8, 1941, and before September 30,1945; gratuities for loss of employment; medical expenses; travel allowances; leave pay; or interest.
*63 (d) In computing rights of withdrawals from the superannuation fund (applicable to employees in service on December 8, 1941), defendant has tallied the salaries of each employee from the time his employment began[79] to the time of his internment by the Japanese. In each instance the tally was made in Chinese dollars (by converting taels into dollars at CN$1.3986 per tael.) The contributions to the fund by the employee and by the Shanghai Municipal Council were then computed, using interest at 4 percent[80] compounded semiannually.[81] The conversion rate of CN$20 to US$1 was' then used to determine the value of the employees’ withdrawal rights.
(e) Projections of pay during internment were computed on the basis of the rate of pay last known to have been received by the employee before December 8, 1941. The totals were then subjected to the conversion rate of 20 to 1.
71. (a) With respect to the possible grant of pay during internment, defendant points out[82] that “it has not been the policy of Congress to provide payment to all American civilians who were interned during World War II,” citing the Missing Persons Act[83] and the War Claims Act of 1948,[84] under neither of which could any of these plaintiffs qualify for such payments.
(b) With further respect to the possible grant of pay during internment, it is to be noted that only two of the seven plaintiffs who were interned are known to have continued in internment to the end of the war. Whether or not pay during internment is allowed as such to the plaintiffs,[85] the fact that five of them were interned for periods more limited than the duration may affect the computations made by plaintiffs for superannuation benefits and interest (if any) thereon, since plaintiffs’ computations of superannuation benefits were predicated on the assumption of continuing pay *64 (with concomitant contributions by employees and Council) to September 30,1945.[86]
XV. EMPLOYEES ; EMPLOYMENT; CLAIMS
William Caspar Blabon, Jr.[87]
72. (a) Mr. Blabon entered the employ of the Shanghai Municipal Council on May 10, 1930, as a probationary sergeant in the Police Department. His Agreement specified a three-year appointment at a salary of “not less than” taels 150 per month “under deduction in the case of every monthly payment of five per cent, thereof being the Employe’s contribution to the Superannuation Fund * * The Council undertook to “provide the Employe with medical attendance free of charge,” and, under stated conditions, to “furnish * * * second class passage to England * *
(b) Mr. Blabon resigned on July 6, 1937, with the rank of sergeant, and the Council gave him a formal, good-conduct discharge.[88]
(c) On February 6, 1939, the Commissioner of Police wrote to Mr. Blabon, in Cupertino, California, that “* * * the Council has approved of your re-engagement on * * * conditions * * * That you return to Shanghai at your own expense * * * Seniority on re-engagement to be that of the most junior Sergeant * * * Previous service to count only towards the qualifying period for marriage benefits * * * That you be certified as fit for service by the Council’s Doctors in Shanghai.”
(d) By Letter of Appointment dated April 27, 1939, Mr. Blabon was appointed to the position of sergeant in the Police Department “from the 25th day of April [1939] at a *65 commencing salary of * * * $301 per mensem * * * subject to the Terms and Conditions of Service * * * as modified by tbe endorsement shown hereon * * *” viz.:
The employee is given seniority as Sergeant, i. e., at the bottom of the list of Sergeants from April 25, 1939. His previous service from May 10, 1930 to July 6, 1937 will count towards the qualifying period for marriage benefits. The qualifying period for long leave and pension shall commence from April 25, 1939. * * *
This Letter of Appointment specified “Appointment Classified as £B’ engaged locally.” Attached to it were the Terms and Conditions of Service which came into force on July 1, 1937, as amended to the date of appointment.
(e) As of April 18, 1941, Mr. Blabon held the rank of detective sergeant in the Shanghai Municipal Police. He was so employed on December 8 (Shanghai time), 1941, and remained in the employ of the Council until his internment by the Japanese.
73. (a) The exact date of Mr. Blabon’s internment by the Japanese is not in evidence. It was sometime in 1943. He was released from internment and repatriated to the United States in October 1943, on the MS. Gripsholm, in the first of the intergovernmental exchanges of nationals between the United States and Japan.
(b) Advances of money were made by the Department of State to Mr. Blabon during his internment and for his repatriation passage in the total amount of $664.03. All such advances have been repaid by him, wherefore no potential offset against him is asserted by defendant.
74. (a) The amount listed in S. 2429 as payable to Mr. Blabon is $1,733.83. This amount was derived from plaintiffs’ extract from the Morcher Document, and represents the following computation:

*66 (b)The amount listed in plaintiffs’ requested findings of fact as the amount due to Mr. Blabon in conformity with the recommendations of the Foreign Advisers is $2,929.10, made up as follows:

(c) Application of the British Terms of Settlement (as interpreted by plaintiffs) to the claim of Mr. Blabon would reflect the following result:

(d) Defendant’s computation of the claim of Mr. Blabon produced an overall figure of $250.51, as follows:

*67 Robert Thomas Bryan, Jr.[89]
75. (a) Mr. Bryan entered the employ of the Shanghai Municipal Council on or about June 1,1928. His Agreement is not in evidence. On September 25, 1981, the Council issued and Mr. Bryan signed a Letter of Appointment on a form “Applicable to employees serving under Agreements on December 31,1930.” This document specified “Appointment Class ‘A’ (Abroad) ” and confirmed his appointment as “Municipal Advocate in the Legal Department from April 1,1931, with pay at the rate of Taels * * * 1,350 per mensem and subject * * * to the General Terms and Conditions of Service dated December 18,1930 * * * attached * * * with the exception that you will not participate in the benefits of the Pension Scheme as you were over 35 years of age on appointment.”
(b) Over the years various endorsements were made on the foregoing Letter of Appointment. On February 8,1937, the provision excluding the employee from participation in the pension scheme was canceled. The remaining endorsements related primarily to rates of pay: (1) as of April 1, 1933, Taels 1,550 per mensem; (2) as of April 1, 1936, $2,517.48 per mensem; (3) as of July 1, 1987, $2,696.15 “per mensem Local Currency”; (4) as of April 1, 1939, $3,096.15 per mensem; and (5) as of June 1,1940, “U. S. Dollars 7,500 per annum payable in equal parts monthly in arrears.”
(c) Mr. Bryan was in Shanghai and in the employ of the Council on December 8, 1941. He continued in employment until his internment by the Japanese.
76. (a) Mr. Bryan and his wife (née Gertrude Idell, also an American citizen) were interned by the Japanese on February 9,1943. Mrs. Bryan was released and repatriated in October 1943, on the first repatriation voyage of the MS. Gripsholm. Mr. Bryan was not released from internment until August 28, 1945, and was repatriated in October 1945 on the hospital ship (USN) Kepose.[90]
*68 (b) Advances of money were made by the Department of State to Mr. Bryan during bis internment and for tbe repatriation of Mrs. Bryan and himself in the total amount of $575.19. Of this amount he has repaid $566.60. Defendant asserts against him as a potential offset a claim for the unpaid balance of $8.59.
77. (a) The amount listed in S. 2429 as payable to Mr. Bryan is $117,448.18. This amount was derived from the Morcher Document extract and represents the sum of the following elements

(b) The amount listed in plaintiffs’ requested findings of fact as the amount due to Mr. Bryan in conformity with the recommendations of the Foreign Advisers is $150,710.16, made up as follows:

*69 (c) Application of the British Terms of Settlement to the claim of Mr. Bryan would, according to plaintiffs’ interpretation, reflect the following result:

(d) Defendant’s computation of the claim of Mr. Bryan produced an overall figure of $26,256.36, as follows:

Crenshaw Bacon Holt[91]
78. (a) Mr. Holt entered the employ of the Shanghai Municipal Council sometime prior to 1930. He received his first Letter of Appointment on June 18, 1931, on the form “Applicable to employees serving under Agreements on December 31, 1930.” The Letter specified “Appointment Class ‘A’ (Abroad) ” and confirmed his appointment as inspector in the Public Works Department from April 1,1931, with *70 pay at the rate of Taels 290 per mensem and subject to the General Terms and Conditions of Service.
(b) Various endorsements were made on the Letter of Appointment over the years. On July 28,1937, the Council confirmed Mr. Holt’s appointment as inspector as of July 1,1937, with classification “B”. Otherwise the endorsements related to rates of pay: (1) as of September 1, 1931, Taels 270 per mensem (reflecting a reduction in rank and pay for a breach of discipline); (2) as of April 1, 1932, Taels 290 per mensem (reflecting reinstatement of both rank and pay); (3) as of September 1, 1933, Taels 335 per mensem; (4) as of September 1, 1936, $503.50 (Taels 360) per mensem; (5) as of July 1, 1937, $562.68 per mensem Local Currency; and (6) as of September 1,1939, $600.83 per mensem.
(c) Mr. Holt was in Shanghai and in the employ of the Council on December 8,1941. He continued in employment until his internment by the Japanese.
79. (a) Mr. Holt and his wife (nee Louise Morgan, also an American citizen) were interned by the Japanese on August 23,1942. Both were repatriated in October 1943, on the first repatriation voyage of the MS. Gripsholm.
(b) Advances of money were made by the Department of State to Mr. Holt during his internment and for the repatriation of Mrs. Holt and himself. These advances have not been repaid by him, and defendant asserts against him a potential offset as described in the next succeeding paragraph.
(c) On April 12, 1957, the Comptroller General of the United States issued the following Certificate of Indebtedness to Mr. Crenshaw B. Holt:
I certify that I have examined and settled the claim of the United States against you and find there is due the United States the sum of $1,842.14.
The Department of State, through the Legation of Switzerland * * * advanced a sum equivalent to $532.16 for subsistence for you and your wife during the period January 11, 1943 to September 1, 1943, whue you were interned by the Japanese * * *. Additional amounts totalling $1,309.98 were advanced to you by the Special Disbursmg Officer of the Department of State for subsistence and cost of transportation for you and your wife *71 on tbe M. S. Gripsholm, from Mormugao, Portuguese, India, to the United States.
The advances were made on a loan basis from public funds appropriated by the Congress for the purpose of furnishing emergency financial assistance to American citizens, who were destitute in foreign countries.
You signed notes in the aggregate of $1,826.40 and your wife * * * signed a note for $15.74, representing medical care, promising to repay this sum upon demand in legal tender of the united States. * * * [Y]ou are liable for the sum of $1,842.14, demand having been made on you for this amount.[92]
80. (a) The amount listed in S. 2429 as payable to Mr. Holt is $22,162.07. This amount was derived from the Morcher Document extract and represents the sum of the following elements:

(b) Plaintiffs’ requested findings of fact list the amount due to Mr. Holt in conformity with the recommendations of the Foreign Advisers as $29,085.03, made up as follows:

*72

(c) Application of the British Terms of Settlement (as interpreted by plaintiffs) to the claim of Mr. Holt would reflect the following result:

(d) Defendant’s computation of the claim of Mr. Holt produced an overall result of nothing due:

Manley Charles Jensen”[3]
81. (a) Mr. Jensen entered the employ of the Shanghai Municipal Council on November 1, 1921. His first “Agree *73 ment” was made on June 15, 1923, whereby he was engaged for three years commencing on February 1,1923, as clerk-of-works in the Public Works Department, with pay at the rate of not less than Taels 285 per mensem “under deduction” of five percent as his contribution to the Superannuation Fund. Renewal Agreements, containing substantially the same terms, were dated January 19, 1926 (pay, Taels 330 per mensem), and December 6,1928 (pay, Taels 375 per mensem).
(b) Mr. Jensen’s first Letter of Appointment, on the form “Applicable to employees serving under Agreements on December 31,1930,” was dated September 10, 1931, and confirmed his appointment as clerk-of-works from April 1, 1931, with pay at the rate of Taels 425 per mensem and subject to the General Terms and Conditions of Service dated December 18,1930.
(c) Endorsements on the foregoing Letter of Appointment reflected (1) promotion, as of February 1, 1932, to architectural assistant, with pay at Taels 495 per mensem; (2) pay increase, as of February 1, 1935, to $797.20 (Taels 570) per mensem; (3) confirmation of appointment, as of July 1,1937, as architectural assistant (subject to the Terms and Conditions of Service dated March 24, 1937), with classification “B” and pay “at the rate of * * * $853.78 per mensem Local Currency * * and (4) pay increase, as of February 1,1938, to $920 per mensem.,
(d) On February 16,1940, the Council adopted and issued the following order:
Pension. Mr. M. C. Jensen, Architectural Assistant, upon retirement is granted a pension at the rate of $3,026 per annum with effect from May 9,1941. He has elected in writing to receive and is entitled to payment of that portion of his local_ currency pension earned prior to July 1, 1937 in Sterling at the fixed rate of exchange of Is. 9% d. to the dollar (2s. 6d. to the tael) and the balance of his local currency pension in U. S. Dollars at the fixed rate of exchange of 29y2 to $100.
82. Mr. Jensen returned to the United States before December 7, 1941. He had begun the use of his “long leave” several months prior to the effective date of his retirement (May 9,1941), the Council having computed (and granted) his long leave to expire on the effective date of his retirement.
*74 83. (a) The amount listed in S. 2429 as payable to Mr. Jensen is $21,746.31. This amount was derived from the Morcher Document extract (after conversion of sterling into United States dollars at the rate of one pound equals $4.0214, and conversion of Chinese Nationalist currency at the rate of CN$20 equals US$1):
Annual pension:[1]
Amount due to December 31,1945_$4, 471.37
Amount due from December 31, 1945, to December 31, 1952 (7 years)_ 7,364.35
Pension fund_ 9, 910. 59
21, 746. 31
(b) No amplification of the foregoing statement of claim has been requested in behalf of this plaintiff,[94] and defendant’s requested findings of fact would eliminate the claim for failure of proof.[95]
(c) Mr. Jensen retired from the service of the Council on May 9,1941, after 19 years, 6 months, and 8 days of service. Although the Terms and Conditions of Service required 20 years’ service for retirement, Mr. Jensen was given a special dispensation. He was then 60 years of age and in ill health.
After his return to the United States he received, in November 1941, one quarterly payment of his pension, in the amount of $263.29. This was payment (in arrears) for the quarter ending September 30, 1941. Between that date and the date his petition was filed, 51 quarters passed. On this basis, the arrears of his pension would amount to $13,413.51.[96] "When the amount of the pension fund claim set forth in the Morcher Document extract is added, the total of his claim appears as $23,324.10.
(d) The foregoing computation represents a close approximation of the result that would follow from applica *75 tion of the British Terms of Settlement to the claim of Mr. Jensen.
Rose Blaine Lane[97]
84. (a) Mrs. Lane entered the employ of the Shanghai Municipal Council around 1920. Her first Letter of Appointment, on the form “Applicable to employees serving under Agreements * * was dated September 16,1931. It specified “Appointment Class {A’ (Abroad)” and confirmed her appointment as stenographer and general assistant in the Education Department from April 1, 1931, with pay at the rate of Taels 310 per mensem and subject to the General Terms and Conditions of Service dated December 18, 1930.
(b) The single endorsement on the foregoing Letter of Appointment was made in July 1937, to confirm the appointment from July 1,1937, subject to the Terms and Conditions of Service dated March 24,1937. The endorsement changed the employee’s classification to “B” and provided pay “at the rate of * * * $525 per mensem Local Currency.”
(c) On September 25,1940, Mrs. Lane wrote to the Treasurer, Finance Department, Shanghai Municipal Council:
I wish to obtain my pension under terms of Appendix V 5 (e), i.e. my local currency pension in U. S. dollars at the rate of 29% to $100; and that portion of local currency pension which corresponds to the number of completed years under Letter of Appointment prior to July 1,1937, at the rate of 1/9%. * * *
(d)l On October 11, 1940, the Council adopted and issued the following order:
* * * Mrs. E. E. Lane, ex-Stenographer and General Assistant, has elected in writing to receive and is entitled to payment of that portion of her local currency pension earned prior to July 1, 1937 in Sterling at the fixed rate of exchange of Is. 9% d. to the dollar (2s. 6d. to the tael) and the balance of her local currency pension in IT. S. Dollars at the fixed rate of exchange of 29% to $100.
*76 (e) On October 29,1940, tbe Superintendent ©f Education of tbe Shanghai Municipal Council issued the following notice “To whom it may concern
* * * This is to certify that Mrs. R. E. Lane will retire from the Shanghai Municipal Council on April 26', 1941. She will be entitled to receive a pension of approximately £107 per annum and to draw Superannuation Monies amounting to £1000 Sterling and Cold $4000.
85. Mrs. Lane retired from the service on April 26, 1941. She came to the United States shortly thereafter, and was in the United States on December 7, 1941.
86. (a) The amount listed in S. 2429 as payable to Mrs. Lane is $12,304.81. This amount was derived from the Morcher Document extract (after conversion of sterling into United States dollars at the rate of one pound equals $4.02%, and conversion of Chinese Nationalist currency at the rate of CN$20 equals US$1) :

(b) Plaintiffs’ requested findings of fact list the amount due to Mrs. Lane in conformity with the recommendations of the Foreign Advisers as $7,044.71, made up as follows:

*77 (c) Application, of the British Terms of Settlement (as interpreted by plaintiffs) to the claim of Mrs. Lane would reflect the following result:
Annual pension from September 30, 1941 (date of last payment) to April 22,1955 (date of death)_$5, 797.44
(d) Defendant has made no separate computation of the claim of Mrs. Lane.[98]
J. W. Lawler”[99]
87. (a) Mr. Lawler’s initial Letter of Appointment was dated February 3, 1939. It specified “Appointment Classified as ‘L’ engaged locally” and appointed him to the position of assistant inspector in the Finance Department— Bevenue Office from August 1, 1938, “at a commencing salary” of $340 per mensem, subject to the Terms and Conditions of Service.
(b) Two endorsements on the foregoing Letter of Appointment noted pay increases: as of January 1, 1941, $390 per mensem; and as of August 1, 1941, $400 per mensem.
(c) Mr. Lawler was in Shanghai and in the employ of the Council on December 8,1941. He continued in employment until his internment by the Japanese.
88. (a) Mr. Lawler, together with his wife and two •daughters, was interned by the Japanese in November 1943. The evidence is silent as to their release and repatriation, except for the showing that Mr. Lawler has had residence in the United States at times subsequent to 1945.
(b) Advances of money were made by the Department of State to MI. Lawler during his internment to the extent of $742.98. These advances have not been repaid by him, and defendant asserts against him a potential offset equal to the amount of such advances.
89. (a) The amount listed in S. 2429 as payable to Mr. Lawler is $4,834.57. This amount was derived from the Morcher Document extract and represents the sum of the following elements:

*78

(b)Plaintiffs’ requested findings of fact list tbe amount due to Mr. Lawler in conformity with the recommendations of the Foreign Advisers as $8,081.71, made up as follows:

(c)Application of the British Terms of Settlement (as interpreted by plaintiffs) to the claim of Mr. Lawler would reflect the following result:

(d)Defendant’s computation of the claim of Mr. Lawler produced an overall result of nothing due:

*79

Thomas O’Dwyer[1]
90. (a) Mr. O’Dwyer’s initial Letter of Appointment was dated January 25, 1933. It specified “Appointment Class ‘A’ (Abroad) Domicile United States of America,” and appointed Mm to the position of probationary sergeant in the Police Department from January 12,1933, at a commencing salary of Taels 175 per mensem, subject to the General Terms and Conditions of Service and to an endorsement extending the probationary period to one year.
(b) There were three other endorsements on the foregoing Letter of Appointment: (1) as of April 1,1933, the employee was transferred “for duty as Assistant Warder at the Gaol (2) as of June 28, 1936, he was promoted to the rank of Warder; and (3) his appointment was confirmed as of July 1,1937, with classification “B”, and pay “at the rate of * * * $318.20 per mensem Local Currency.”
(c) Mr. O’Dwyer was in Shanghai and in the employ of the Council on December 8,1941. He continued in employment until his internment by the Japanese.
91. (a) Mr. O’Dwyer was interned by the Japanese on February 18,1943. He was released in September 1945 and was then repatriated to the United States, with his wife (an alien) and his infant daughter, on a United States Navy hospital ship.
*80 (b) Advances of money were made by tbe Department of State to Mr. O’Dwyer during his internment and for the repatriation of his family and himself to the extent of $946.55. These advances have not been repaid, and defendant asserts against him a potential offset in the amount of such advances.
92. (a) The amount listed in S. 2429 as payable to Mr. O’Dwyer is $7,254.73. This amount was derived from the Morcher Document extract and represents the sum of the following elements:

(b) Plaintiffs’ requested findings of fact list the amount due to Mr. O’Dwyer in conformity with the recommendations of the Foreign Advisers as $11,592.18, made up as follows :

(c) Application of the British Terms of Settlement (as interpreted by plaintiffs) to the claim of Mr. O’Dwyer would reflect the following result:

*81 (d) Defendant’s computation of the claim of Mr. O’Dwyer produced an overall figure of $67.96, as follows:

Roy Powderly Roberts[2]
93. (a) Mr. Roberts entered the employ of the Shanghai Municipal Council on April 1, 1914, and served for many years as senior assistant land surveyor in the Public Works Department at a salary of Taels 250 to 600 per month. In January 1937, while Mr. Roberts was in Seattle, Washington, on “long leave,” the Council authorized his retirement on March 31, 1937, with the grant of a minimum pension from April 1,1937.[3]
(b) Following are the texts of three orders adopted and issued by the Council, two on March 24, 1937, and one on April 12,1937:
* * * Mr. R. P. Roberts, Senior Assistant Land Surveyor, retires on March 31, 1937 with Pension and Full Superannuation. Twelve months’ pay in lieu of notice, with exchange compensation on Repatriation Pay but without Superannuation benefits, is authorised for issue to him. * * *
*82 * * * Pension. Mr. B. P. Roberts * * * upon retirement is entitled to a pension of tbe equivalent of Tls. 1,835 per annum with effect from April 1, 1937. * * *
* * * Mr. B. P. Roberts * * * has elected in writing to receive and is entitled to payment of his silver pension in Sterling at the fixed rate of exchange of the equivalent of 2s/6dtothetael. * * *
94. Mr. Roberts returned to the United States in 1937 and was in this country on December 7,1941.
95. (a) The amount listed in S. 2429 as payable to Mr. Roberts is $21,540.63. This amount was derived from the Morcher Document extract as follows:
Annual pension:[1]
Amount due to December 31,1945_$3,923. 75
Amount due from December 31, 1945, to December 31, 1952 (7 years)- 6,462.54
Pension fund_11,154.34
21, 540.63
(b) Plaintiffs’ requested findings of fact list the amount due to Mr. Roberts in conformity with the recommendations of the Foreign Advisers as $24,902.99, made up as follows:

(c) Application of the British Terms of Settlement (as interpreted by plaintiffs) to the claim of Mr. Roberts would reflect the following result:
Pension (to May 31, 1954)_$11, 694.18 Funding cost_ 10, 877.19 22,571. 37
*83 (d) Defendant has made no separate computation of the claim of Mr. Roberts.[4]
E. J. Thoemmes[5]
96. (a) Mr. ^Thoemmes entered the employ of the Shanghai Municipal Council on June 12, 1934, as a probationary sergeant in the Police Department, and continued in service to attain the rank of detective sergeant.[6]
(b) The commencing salary of Mr. Thoemmes’ initial position was Taels 150 per month while that of his final position was $301 per month.
(c) Mr. Thoemmes was in Shanghai and in the employ of the Council on December 8, 1941. He continued in employment until September 7, 1942, when he resigned.
97. (a) Mr. Thoemmes was interned by the Japanese on September 19,1943. Presumably, his wife and two children were interned with him. The evidence is silent as to his repatriation except for the showing that he has had residence in the United States since 1945.
(b) Advances of money were made by the Department of State to Mr. Thoemmes during his internment for subsistence and medical care for himself and his family to the extent of $1,811.46. These advances have not been repaid by him, and defendant asserts against him a potential offset in the amount of such advances.
98. (a) The amount listed in S. 2429 as payable to Mr. Thoemmes is $3,252.63. This amount was derived from the Morcher Document extract as follows:

*84 (b)Plaintiffs’ requested findings of fact list the amount due to Mr. Thoemmes in conformity with the recommendations of the Foreign Advisers as $6,041.27, made up as follows:

(c)Application of the British Terms of Settlement (as interpreted by plaintiffs)! to the claim of Mr. Thoemmes would reflect the following result:

(d)Defendant’s computation of the claim of Mr. Thoem-mes produced an overall result of nothing due:

*85 Grace Belle Warmoth[7]
99. (a) Miss Warmoth entered the employ of tbe Shanghai Municipal Council in September 1928 as a teacher in the Education Department. Her first Letter of Appointment, on the form “Applicable to employees serving under Agreements * * certified “Appointment Class ‘A’ (Abroad),” and confirmed her appointment as assistant mistress in the Education Department from April 1, 1931, with pay at the rate of Taels 315 per mensem, subject to the General Terms and Conditions of Service.
(b) Endorsements on the foregoing Letter of Appointment showed further confirmation as of July 1, 1937, with classification “B” (which was again changed to “A” effective May 1, 1939), and pay adjustments as follows: (1) as of July 1, 1932, Taels 370 per mensem; (2) as of July 1,1935, $594.41 per mensem; (3) as of July 1, 1937, $636.59 per mensem “Local Currency”; (4) as of July 1, 1938, $696.59 per mensem; and (5) as of July 1,1941, $756.59 per mensem.
(c) Miss Warmoth was in Shanghai and in the employ of the Council on December 8,1941. She continued in employment until her internment by the Japanese.
100. (a) Miss Warmoth was interned by the Japanese on February 13, 1942, and was repatriated in October 1943 on the first repatriation voyage of the MS. Gripsholm.
(b) Advances of money were made by the Department of State to Miss Warmoth during her internment and for her repatriation, to the extent of $881.99. These advances have not been repaid by her and defendant asserts against her a potential offset in the amount of such advances.
101. (a) The amount listed in S. 2429 as payable to Miss Warmoth is $10,856.37. This amount was derived from the Morcher Document extract as follows:

*86 (b)Plaintiffs’ requested findings oí fact list tlie amount due to Miss Warmoth in conformity with the recommendations of the Foreign Advisers as $16,120.23, made up as follows:
Superannuation_$6,438. 02
Pay_ 2,129.82
Gratuity_ 2,354.02
10,921.86
Less advance_ 65.49
10, 856.37
Interest_ 4,84L 86
Medical expenses_ 72. 00
Travel allowance_ 350. 00
16,120.23
(c)Application of the British Terms of Settlement (as interpreted by plaintiffs) to the claim of Miss Warmoth would reflect the following result:
Superannuation (full)_$6,438.02
Gratuity (full)_ 2,354.02
Pay (one-half of pay minus advance)- 1,032.16
9, 824.20
(d)Defendant’s computation of the claim of Miss War-moth produced an overall figure of $604.75, as follows:
Contributions to the superannuation fund by the employee and the Council from April 1, 1931 (the date of her first employment, according to defendant) to February 13, 1942 (the date of her internment)_CN$11, 676.56
Interest_ CN$2,777.79
CN$14, 454.35
Converted into United States dollars at the official rate of exchange (20 to 1)_ US$722.72
Projected salary during the period of her internment_CN$15,280.48
Converted to United States dollars as above_ US$764. 02
Total United States dollars- US$1,486. 74
Less offset_ US$881.99
Balance. US$604.75
*87 102. (a) Five tables, following, are incorporated in this finding.
(b) Table 1 contains summaries of (1) the claims of plaintiffs as variously computed and (2) the advances by and repayments to the Department of State, all as set forth in detail in findings 72 through 101.
(c) Table 2 summarizes the claims directly related to retirement benefits.
(d) All other claims have been grouped as claims relating to severance, and are summarized in Table 3. Claims for pay during internment have been segregated in such manner as to show the totals of severance claims with and without such pay.
(e) In Table 4 retirement and severance claims have been combined to obtain two sets of totals, one without internment pay and one with internment pay.
(f) In Table 5 defendant’s offsets have been deducted from the totals tallied in Table 4, to obtain balances without internment pay and with internment pay.
(g) Claims for interest have been eliminated in all summaries except Table 1.

*88

*89

*90 §SS!§§gB§S§ §§3S?g3!3KSSfe ammm Ss'sCa^^'s e^fe3?5i3feS§ ¿sfsfcf****'** §SS!§§SS§Sg *-T T-Í* lll^ggsia Balance including pay ThoUmmes-Blabon.. fc: Balance excluding pay Table 5
*91 103. The difficulties encountered by the Shanghai Municipal Council in meeting its foreign exchange obligations in 1940-1941 (prior to the extension of World War II into the Pacific) and the continued inflation of the Chinese currency during the war period warrant the conclusion that, in the years immediately following the Japanese surrender, the realities of the situation might well have compelled both the Council and its employees to accept a compromise settlement representing lesser payments to the employees than those recommended by the Foreign Advisers.
104. The evidence as a whole does not warrant acceptance of the extract from the Morcher Document (upon which plaintiffs have relied for all of their computations) as being fully and accurately representative of the Morcher Document.[8]
105. (a) The evidence as a whole does not sustain the description in S. 2429 of the sums set opposite the names of the claimants as representing amounts “* * * actually due * * *” or “* * * to secure * * * retirement benefits * * *.”[9]
(b) The evidence as a whole does not warrant acceptance of plaintiffs’ computations based on their interpretations of (1) the Foreign Advisers’ recommendations or (2) the British Terms of Settlement.
(c) The precedent afforded by the British Terms of Settlement is qualitative but not quantitative.[10]
(d) Defendant’s computations (1) include pay during internment, (2) omit pension payments, and (3) reflect a lack of balance as shown by the following summary:

*92

106. If payments are to be made to the plaintiffs (either ex gratia, or as allowances equitably due), and if the amounts of such payments are to be brought into balance, resort must be had to formulas arbitrarily adopted.
107. (a) Listed below, after the names of the several plaintiffs, are: (1) ages (as of birthday nearest to March 31,1958, if living; if not, at time of death); (2) years of service with the Council (prior to December 8, 1941); and (3) monthly salaries in Chinese dollars as of the date nearest to July 1, 1937, for which figures are available.

(b) Listed below, after the names of the several plaintiffs, are their monthly and annual salaries in United States dollars, computed at the rate of exchange (US$29% equals CN$100) established by the Council’s Terms and Conditions of Service of July 1, 1937.

*93

(c) Since the salaries of plaintiff Bryan appear in the foregoing list as $795.36 per month and $9,544.32 per annum, in 1937, whereas his salaries in 1941 on the basis of United States dollars were $625 per month and $7,500 per year, the conclusion follows that either the exchange rate of US$29% to CN$100 is too high, or that there existed some difference between the scaling of salaries for plaintiff Bryan and the scaling of salaries for the other plaintiffs. The evidence as a whole warrants (1) acceptance of the latter alternative as the more probable explanation and (2) the conclusion that plaintiff Bryan’s 1937 salary in Chinese dollars should be translated into United States dollars at the rate of CN$1 equals US$0.19, to bring it into realistic balance with the salaries of the other plaintiffs. On this basis, the figures $512.27 (monthly) and $6,147.24 (annual) should be substituted for the figures $795.36 and $9,544.32, respectively, after the name of plaintiff Bryan.
108. Table 6 is incorporated in this finding. Its purpose is to show the results of (1) allowing to each employee the commuted value of medical expenses and travel allowances[11] and (2) offsetting that total against unpaid balances of advances made by the State Department.[12] These results are summarized below on an assumed basis of offsets to the Department and payments to the plaintiffs.

*94

109. (a) Mr. Roberts is tbe only living prewar pensioner. As of March 31, 1958, pension payments to him had been in arrears for 66 quarters. Adopting as an arbitrary limit the total of 80 quarters (being 20 years: the period of service required to qualify for a pension), payment of his pension (80 quarters at $230.81 each) would require $18,464.80.[13]
(b) The other two prewar pensioners (Mrs. Lane and Mr. Jensen) are dead.
(c) Payment of 54.13 quarterly arrears[14] of the pension[15] of Mrs. Lane would require $5,740.49.[16]
(d) Payment of 62.8 quarterly arrears[17] of the pension[18] of Mr. Jensen would require $16,517.03.[19]

*95

*96 110. Listed below, after the names of the plaintiffs (other than the three prewar pensioners) are (1) ages and years of service as listed in finding 107 and (2) the amounts that would be required to pay each of them one-half of his annual salary as computed in finding 107 for each of his years of service.

111. Table 7 is incorporated in this finding. In it are combined the results of findings 108, 109 and 110. The column headed “Balance Payable” reflects amounts determined in accordance with the standards set forth in findings 106 through 110.
*97 K888888888 § B <1 H SüSSÍ^SSStsS 8S88@888S8 sllsgl^il Years of service Lawler. O’D Rob Thoemmes. warmoth— 2E?:: Blabon. Plaintiffs None None 348.02 144.45 1.00 i.44 Advances 473.46 459.99 STone tone None None $998.14 Offsets 3,996.00 14,929.31 sens'? 80 *910 Z 8:1 10, £ Salary payments 18,464.80 $16,517.03 5,740.49 payments

 For brief reviews of the events lending to tbe signing of these treaties and of the rights held by the united States thereunder see The Chinese Exclusion case, 1889, 130 U.S. 581, 590-593; Reid v. Covert, 1957, 351 U.S. 1, 60-61; 2 Hyde, Internationa) Law, 2d Rev. Bd., pp. 868-871, and the findings of fact set out below.

 33 Stat. 2208, 2215.

 Treaties, Conventions, International Acts, Protocols, and Agreements between tbe united States of America and other Powers, 1910-1923, vol. Ill, p. 3131.

 44 Stat. 2113. See 2 Hyde, International Law, 2d Rev. Ed., pp. 868-871.

 See Article XVII, Treaty of November 22, 1894, between the United States and Japan, 29 Stat. 848, 853. See also, 1 Hyde, International Law, 2d Bev. Ed., § 128.

 United States Treaties and other International Agreements, vol. 7, part 3 (1956), p. 3043.

 The year was 19B3.

 The Chairman of the Committee transmitted the reguest on July 22, 1953.

 The report of the Department of State was initially prepared in response to a request from the Chairman of the (House) Committee on the Judiciary with respect to the House bill, and was submitted to the Bureau of the Budget on July 22, 1953.

 Tlie Bureau of the Budget returned the report to the Department of State on January 4, 1954, together with a memorandum of Ita own views, and the Assistant Secretary of State forwarded both the departmental report and the Bureau memorandum to the Chairman of the Senate Committee on January 8, 1954.

 The text of S. Res. 257 follows : “Resolved, That the bill (S. 2429) entitled, ‘A bill for the relief of certain American employees of the former Shanghai Municipal Council’, now pending in the Senate, together with all accompanying papers, is hereby referred to the united States Court of Claims pursuant to' sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same, in accordance with the provisions of said sections, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.”

 The report also included, as attachments which were “made a part” thereof, (1) the letter of January 8, 1954, from the Assistant Secretary of State to the Chairman of the Committee; (2) the memorandum of January 4, 1954, from the Assistant Director for Legislative Reference of the Bureau of the *27 Budget; and (3) a brief “submitted to tbe committee, which sets forth in some detail the history of the International Settlement as well as the events which brought about the claim on the part of these American citizens.”

 R. M. Jordan and J. J. Surel.

 Mrs. Lane married an American citizen in Shanghai in 1924. She acquired American citizenship by naturalization on November 27, 1942, some 18 months after her retirement from the Council’s service and the beginning of her residence in the United States. Without such residence naturalization had been impossible.

 The evidence is not concerned with when or why any of the plaintiffs went to live in Shanghai.

 The seven were: Messrs. Blabon, Bryan, Holt, Lawler, O’Dwyer, and Thoem'mes, and Miss Warmoth. The other three, Messrs. Jensen and Roberts and Mrs. Lane were in the united States.

 One of the plaintiffs (Mr. Bryan) has filed with the court an affidavit stating that on December 8, 1941, he and other officers of the Council were told that they and their subordinates would have to remain in the employ of the Council until they were retired or permitted to resign; and that thereafter the Commander of the Japanese Forces in Shanghai issued a proclamation to the effect that all employees of the Council would remain at their posts, under pain of death, until relieved or allowed to resign.

 Mr. Blabon.

 Mr. Bryan.

 Plaintiffs Holt, Lawler, O’Dwyer, Thoemmes, and Warmoth.

 Offsets should be made, defendant urges, against even em gratia payments. Defendant denies legal or equitable obligation to make payments to any of the plaintiffs.

 The Japanese controlled Shanghai and the Council when the next payment was due (December 31, 1941). When Shanghai was liberated, control of its assets (as well as responsibility for its obligations) passed to the Government of China. The Council never again functioned as such.

 Survey of American Foreign Relations (prepared under tlie direction of Charles P. Howland), 1930, pp. 178-177.

 A Concession usually represented an area set apart by tbe Chinese for the use of a particular foreign nation, under whose authority the area was controlled, subdivided, and developed.

 Settlements lacked the unity of control that characterized the Concessions.

 The reference here is to jurisdiction of the courts for the administration of justice. Such jurisdiction was an entirely separate matter from local administration in the nature of municipal government.

 By way of illustration, there was for many years a united States District Court in Shanghai. The judge was appointed by the President and confirmed by the Senate. His judgments were subject to review by the Court of Appeals of the Ninth Circuit.

 By 1900 there were 14 of the so-called “Treaty Powers”: Belgium, Brazil, Denmark, Prance, Great Britain, Italy, Japan, The Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, and the united States. Trade treaties containing some of the same features also existed between China and Russia.

 The Manchu dynasty had been overthrown In 1912, and was succeeded by the republic of Sun Yat-Sen. The Kuomintang party came into existence at the same time, as a dissident element in the revolutionary movement. The ascendancy of the Kuomintang under Chiang Kai-shek began in 1926. Its dominance lasted from 1928 until after the end of World War XI.

 The Extraterritoriality Commission consisted of representatives of China and each of the Treaty Powers except Brazil and Switzerland.

 During 1928-1929 nearly all the Western Powers formally assented to tlie resumption by China of her tariff autonomy, and the Chinese Government put into effect in 1929 a schedule of duties determined by itself.

 On the part of the united States these negotiations of the early 1930’s were infused with the “yes-but” techniques characteristic of the translation of abstract principles into concrete measures.

 United States policy favored and promoted recognition of China as one of the Great Powers in the prosecution of the war. See United States Relations with China, a book “based on the files of the Department of State,” published in 1949 by the Department of State, page 37.

 Prepared and published for the Council on Foreign Relations. “The purpose of the Council on Foreign Relations is to study the international aspects of America’s political, economic, and financial problems.” Page v. In 1930 John W. Davis was President and Elihu Root was Honorary President of the Council. The excerpts are from pages 161-166.

 According to Chinese concepts all land belonged to the Emperor. Outright alienation of any portion of it (to a foreigner or to a subject) would have run counter to their concepts.

 As phrased by defendant, “the foreign settlements just grew as a result of increased trade, for the expediency of the merchants and as a means of self-protection.”

 Pages 160-167.

 Both parties have called attention to the fact that the Council was basically more of an instrumentality of the Settlement than an institution in its own right. Agreement between the foreigners and the Chinese authorities required exchanges on the diplomatic level. Some administrative measures required Consular approval. Tax levies and appropriations required action by the ratepayers (voters). The Council was the administrative agency for the execution of municipal functions.

 The Council’s Balance Sheet for the year 1941 showed assets (and liabilities) totaling Chinese dollars 264,852,073.43, being the equivalent (US$5 9/32=CN$100) of United States dollars 13,987,500.14. Among the trust Eunds the superannuation fund was listed at CN$17,805,157.13 and the pension fund at CN$10,865,359.00. Physical assets (land, buildings, stock, stores, and plants) accounted for a total value of CN$179,824,897.16.

 As previously noted, the administration of justice through courts of law and the administration of local government were two entirely dlfCerent things. The organization and operation of the courts rested squarely on treaty authorizations of extraterritorial rights. Local municipal government did not. The Shanghai Municipal Council could resort to the courts or be haled into them. It had no power over them or responsibility for them.

 Pages 170 and 174-176.

 On December 31, 1930, tbe Council employed a total of 10,195 persons, of whom 7,045 were Chinese. Many nationalities other than British and American were represented among the 2,650 foreigners employed.

 The year 1937 marked an era of greater stability in the Chinese currency than 1941. Some of the modifications made by the 1941 revision are pertinent to the currency inflation which plagued China after the war with Japan became general, in mid-1937.

 Described in finding 42 et se<¡.

 The Council meticulously maintained tie basic rates of pay as the foundation of its contractual commitments to its employees.

 The Council’s financial difficulties were due entirely to the decline of the Chinese currency. No impairment of its position occurred in terms of physical assets.

 The specified rate in 1937 was uS?29% to CN$100.

 The British Treaty of Relinquishment, signed the same day as the American treaty (January 11,1943), contained simitar provisions.

 The thoroughness with which the Chinese shouldered their initial responsibilities was illustrated by their occupation of at least two privately owned (American) utilities, which they yielded only after vigorous representations by the united States.

 Japanese control of the Council was asserted on December 8, 1941. Subject to such control, the employment procedures theretofore developed and used by the Council were continued until the creation of the puppet regime. The evidence is silent as to the governance of the International Settlement thereafter, until the transfer to China in September 1945.

 The American Adviser was appointed by the American Consul General in Shanghai.

 The Chinese members included the Director of the Bureau of Finance of the Shanghai Municipal Government (who served as chairman of the subcommittee.), the Treasurer of the Shanghai Municipal Government, the President of the Shanghai District Court, and the Director of the Bureau of Foreign Affairs at Shanghai.

 Responsibility for these payments, subject always to determination of the amounts, was recognized by all as “ * * * indisputable as an official liability of the International Settlement.”

 The Chinese members of the Commission recognized that, under the Terms and Conditions of Service, some of the superannuation and pension payments were payable in Chinese currency convertible to foreign currency, but stood on the literal wording of the Council’s 1941 provision that such payments would be made in foreign or local currency at the Council’s discretion. They refused to consider the Council’s provision for and practice of providing the exchange at the rates stipulated by it. Cf. finding 35.

 The chairman was a Chinese, and mayor of Shanghai.

 The Ambassadors of Great Britain, the United States, and The Netherlands, and the Minister of Switzerland.

 Since the deliberations ol the Liquidation Commission -were already deadlocked, the Foreign Advisers -were, in practical effect, making their recommendations to their respective Ministers for consideration of the settlement on the diplomatic level. Because of this, defendant urges the discount of their recommendations, as having been made for purposes of bargaining between the Western diplomats and the Chinese Government.

 This recommendation encompassed payments in foreign currencies at rates of exchange provided in the contracts of employment.

 The Resolutions recommended benefits in excess of those listed in the Morcher Document in several instances.

 Provision was made In the Resolutions for trustees to administer the pension fund and to return the corpus thereof to the Chinese Government after all obligations had been satisfied.

 The issue arose in Parliament over advances to British subjects formerly employed by the Siamese Government. As to them, a responsible Minister told the House of Commons in July 1943: “* * * many of them gave up other employment to take up service with the Siamese Government as a result of advice or encouragement given them by His Majesty’s Government * * He added that as to "* * * the position of British pensioners of the Shanghai municipal council and similar municipal bodies in China * * * I do not think there are adequate grounds for discrimination * * He further pointed out that the advances would be recoverable “insofar as the pensioners after the war receive payment of pensions due during the War period.”

 The amounts were Included In Foreign Office Budgets.

 The notices were mailed by John Book & Company, London, longtime agent of the Shanghai Municipal Council.

 Tie Eoreign Advisers’ Resolutions defined the Morcher Document as including “* * * the letters signed by Mr. * * * Morcher * * * dated August 30th, 1946 and October 2nd 1946, and * * * the Explanatory Memoranda, Schedules, Summaries and Directives attached thereto * * * and * * * known * * * as the ‘Morcher Document’.”

 No copies were available in the united States when the document became material to the proceeding. By that time Shanghai was controlled by the Chinese Communists, and lines of communication with the West were virtually closed.

 The origin and development of this extract are not fully explained by the evidence. In part, it represents a selection and computation by one of the plaintiffs (Mr. Bryan) for presentation to the Committee on the Judiciary of the Senate. Defendant discounts its probative value (not because of methods used in its preparation but) because of the absence of component figures subject to verification.

 See finding 52(a).

 Notably (1) interest; (2) pensions to employees who became eligible therefor between December 8, 1941, and September 30, 1945; (3) medical expenses ; and (4) travel aUowances,

 See finding 33.

 See finding 52(7).

 Plaintiffs Bryan and Holt.

 See finding 34.

 See finding 32(b).

 See finding 62(6).

 See finding 62(6).

 Except, of course, interest on the superannuation contributions.

 See finding 52(3).

 See finding 52(5).

 Tie objective appears to have been to provide full pay during tbe time the employees were interned (in the case of Allied nationals) or unemployed (in the case of Chinese and neutral nationals).

 Tlie Moreher Document, the Foreign Advisers’ recommendations, and the British Terms of Settlement.

 Defendant submitted the computation in response to a specific request by the Commissioner. As noted in the Initial Pretrial Memorandum “it was understood that defendant would submit findings directed to the second issue [the amounts equitably due from the united States to the claimants] even if its findings on the first issue [the existence of equitable considerations] should be designed to negative the existence of equitable considerations.”

 Cf. finding 37(b).

 As to these, defendant has omitted final tallies of amounts due. Defendant denies the validity of the claim of the third prewar pensioner.

 Defendant cites the language of S. 2429, describing the potential payments as “amounts deducted from * * * salaries * * * to secure retirement benefits ♦ *

 Strict standards oí proof have been applied by defendant to tbe determination of the beginning of employment in each instance.

 Defendant contends that the rate of interest used by the Council is not established by the evidence. It has therefore used a rate “higher than the * * * rate utilized by the Civil Service Commission * * *.”

 As provided by the Terms and Conditions of Service.

 In its objections to plaintiffs’ requested findings of fact, pp. 92-93.

 56 Stat. 143, 50 App. U.S.C. 101.

 62 Stat. 1240, 50 App. U.S.C. 2001.

 Defendant has computed this pay for the period of internment.

 This was the scheme of the Morder Document computations. British nationals predominated in the foreign (Western) employees of the Shanghai Municipal Council and, for that matter, in the foreign (Western) population of the International Settlement. While the evidence is all but silent on the point, fragmentary indices point to the inference that a majority (perhaps aU) of the British employees were interned for the duration.

 Born February 12, 1908, in San Jose, California. Unmarried during his residence in Shanghai. Married Alma Dierking, in San Jose, October 14, 1945. Died March 25, 1950. No children. Mrs. Blabon is his widow and sole heir at law.

 Presumably the amounts that had accrued to his account in the superannuation fund, together with all other emoluments to which he was then entitled by reason of his employment, were paid to him by the Council upon his resignation.

 Born October 13, 1892, In China, of American missionary parents. Most of his life prior to 1953 (except for schooling in the united States) has been spent in China. Resident of Arlington, Virginia, since 1953. Mr. Bryan is the most articulate member of the group of plaintiffs. It was he who organized the material and made the presentation to the Senate Committee on the Judiciary in support of S. 2429.

 Sometime later Mr. Bryan returned to Shanghai to practice law. When the Chinese Communists gained control of Shanghai, he was again imprisoned for 16 months during 1952-53. Upon his release he returned to the United States.

 Born August 12, 1897, in Alexandria, Virginia. Resident of New York City since 1943.

 The Certificate of Indebtedness recited the “date of first demand” as April 17, 1944.

 Born July 14, 1880, in San Francisco, California. Resident of Ohio after his return from Shanghai (prior to December 7, 1941) until his death on June 12,1957. ■ Johan Jensen is his son and executor.

 At the rate of $1,052.05 per annum, consisting of £217-15-10 plus $175.48.

 The claim in behalf of Mr. Jensen was filed separately from the claims of the other nine plaintiffs.

 Defendant contends that proof is lacking to show that Mr. Jensen qualified for a pension, inasmuch as his service was terminated just short of the required 20 years.

 Computed as 51X $263.01, reflecting a quarterly sum derived by $1,052.05^4.

 Born Rose Elaine Eavez, September 12, 1892, in Hong Kong, of Swiss parents. Married Edwin Edward Lane. American citizen, on April 17, 1924, in Shanghai. Lost Swiss citizenship through marriage. American citizenship not available without residence in united States. Mrs. Lane came to California from Shanghai in 1941. Naturalized November 27, 1942. Died April 22, 1955. The Bank of America National Trust and Savings Association is the executor of her estate.

 Defendant’s requested findings of fact contain the following recitations, which are in accord with the evidence: “* * * On April 26, 1941, Mrs. Lane retired and elected to receive * * * her * * * pension * * *. Her pension, as converted, amounted to £90-13-8 and US$59.21 annually, payable quarterly in arrears from April 26, 1941. The last quarterly pension paid Mrs. Lane was for the period ending September 31 [sic], 1941 in an amount of * * * US$106.05 * *

 Born January 20, 1914, in Amarillo, Texas.

 Born December 15, 1905, In County Clare, Ireland. American citizenship (1) asserted by plaintiffs; (2) not challenged by defendant; (3) unexplained by the evidence. Mr. O’Dwyer has lived in or near Boston, Massachusetts, since his return from Shanghai.

 Born March 4, 1887, near Alta Vista, Kansas. Resident oí Colorado since Ms return from Shanghai.

 The Council offered passage from the united States to Shanghai for Mr. Roberts and his wife, and single passage from Shanghai bach to the United States. It also authorized the issue to him of full superannuation and of 12 months’ pay in lieu of notice. According to the Council’s advices to Mr. Roberts: “The pension to which you are entitled from April 1, 1937, amounts to the equivalent of Taels 1,835 per annum and your Superannuation, with exchange compensation, will amount to approximately $67,009.”

 At tbe rate of $923.22 per annum, consisting of £229-7-6.

 Defendant's requested findings of fact contain tie following recitations, which are in accord with the evidence: “Roberts * * * retired on March 81, 1937, with a pension of Taels 1,835 per year * * * which he elected * * * to receive at the fixed rate of 2s. 6d. to the Tael. * *

 Born August 27, 1911, in Cleveland, Ohio. Resident of Los Angeles, California, since his return from Shanghai.

 Only fragmentary evidence is available as to Mr. Thoemmes' employment. Such as there is warrants the inference that his employment was in regular course, by standard Letter of Appointment subject to the Terms and Conditions of Service.

 Born February 2, 1896, in Morrow County, Oregon. Resident of California since her return from Shanghai.

 (1) No reason Is given in the evidence for the failure of the extract (i) to list gratuities for plaintiffs Bryan and Holt, when both were to be awarded leave-pay, or (ii) to list leave-pay for Miss Warmoth, who was to have a gratuity. (2) The vagaries of fluctuating foreign exchange rates are reflected in the extract. If, for example, the 1941 salary of plaintiff Holt, CN$600, was worth US$30 at rates of exchange then current, the 1941 salary of plaintiff Bryan, US$625, was worth CN$12,500.

 Substantial portions of the claims of the seven plaintiffs who were in Shanghai on December 8, 1941, consist of claims for (1) severance pay allowances (viz, gratuities and leave pay) and (2) pay during internment.

 (1) The amounts paid under the settlement were derived from the Morcher Document, which is not available here. (2) Allowance of internment pay (in whole or in part) to September 30, 1945, has no application here, in principle (finding 71), or, as to five of the seven plaintiffs, in fact (finding 71). (3) The British settlement was begun during the war, extended in 1946, and made final in 1949.

 See Table 3. finding 102.

 See Table 1, finding 102.

 As compared with $21,540.63 listed in S. 2429; $24,902.99 according to plaintiffs’ interpretation of the Foreign Advisers’ recommendations; and $22,-571.39 by the British Terms of Settlement.

 From September 30, 1941 (date of last payment) to April 12, 1955 (date of Mrs. Lane’s death).

 At the rate of $106.05 per quarter.

 As compared with: (1) S. 2429, $12,304.81; (2) Foreign Advisers’ recommendation, $7,044.71; and (3) British Terms of Settlement, $5,797.44.

 From September 30, 1941 (date of last payment) to June 12, 1957 (date of Mr. Jensen’s death).

 At the rate of $263.01 per quarter.

 As compared with $21,746.31 in S. 2429.